Filed 12/21/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059475 |
| v. | (Super. Ct. No. 13ZF0163) |
| LONNIE LOREN KOCONTES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, William Lee Evans (Retired judge of the Orange Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), Gregg L. Prickett, James A. Stotler, and Richard M. King, Judges. Affirmed. Request for judicial notice granted.

Tracy A. Rogers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa Mandel and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Lonnie Loren Kocontes of murdering his ex-wife for financial gain off the coast of Italy. Kocontes concedes sufficient evidence supports his conviction.[1] He challenges, however, numerous procedural and evidentiary rulings. Although the trial court erred by admitting evidence, Kocontes was not prejudiced, and his constitutional rights were not infringed. We affirm the judgment.

FACTS

In May 2006, Kocontes and Micki Kanesaki, his ex-wife, were cruising toward Naples, Italy. After a night of dinner and likely entertainment, they returned to their cabin. About 6:00 a.m. the next morning, Kocontes reported Kanesaki missing. The ship's crew did not find her. About 36 hours later, another ship recovered Kanesaki's body; three medical examiners concluded she did not drown.

A. Pretrial

In June 2013, the Orange County Grand Jury indicted Kocontes for murder for financial gain (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(1), all further statutory references are to the Pen. Code, unless otherwise indicated). There was much pretrial litigation concerning whether Kocontes could be prosecuted in Orange County, whether the prosecution committed outrageous conduct, and whether his Sixth Amendment rights pursuant to *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*), were violated. Kocontes filed many of these same motions with Judge Gregg L. Prickett, Judge James A. Stotler, and Judge Richard M. King. We discuss these motions in detail below.

This case spawned numerous writ petitions, a dismissed appeal, one prior opinion (later ordered depublished), and another stayed appeal pending the decision in the instant appeal. (*People v. Kocontes* (G060333), app. pending; *In re Kocontes* (Feb. 11, 2021, G059856), petn. den.; *Kocontes v. Superior Court* (Apr. 25, 2019, G057566),

---

[1] After conceding this point, Kocontes states he described the facts in summary fashion with additional facts included with each alleged error. He was required to provide a summary of the significant facts. (Cal. Rules of Court, rule 8.204(a)(2)(C).)

petn. den.; *Kocontes v. Superior Court* (Apr. 25, 2018, G055635), petn. den.; *Kocontes v. Superior Court* (Apr. 25, 2018, G055634), petn. den.; *Kocontes v. Superior Court* (Nov. 7, 2017, G055532), petn. den.; *Kocontes v. Superior Court* (June 16, 2017, G054381), petn. den.; *In re Kocontes* (June 16, 2017, G054867), petn. den.; *In re Kocontes* (Feb. 18, 2016, G051809), rev. denied and opn. ordered nonpub. June 8, 2016, S233398 (*Kocontes*); *Kocontes v. Superior Court* (Dec. 24, 2014, G051135), petn. den.; *People v. Kocontes* (Oct. 6, 2014, G048763), app. dism.; *Kocontes v. Superior Court* (Aug. 28, 2014, G050582), petn. den.; *Kocontes v. Superior Court* (Sept. 27, 2013, G049056), petn. den.) We discuss our prior opinion, *Kocontes, supra,* G051809, below.[2]

*B. Trial*

Both parties filed in limine motions regarding the admissibility of evidence. We discuss these motions in detail below (we have omitted capitalizations).

*1. Prosecution*[3]

*a. The Background*

Kocontes, an attorney, and Kanesaki, a legal assistant, met while working at the same law firm. They married in the mid-1990's. In 1999, it was alleged Kocontes engaged in inappropriate sexual conduct with a female. Fearing a civil suit arising from that allegation, Kocontes and Kanesaki divorced to protect their assets but continued to live together. The allegations derailed Kocontes's legal career and negatively impacted his marriage. Later, Kocontes and Kanesaki commingled funds and made their residence joint property.

---

[2]     We grant the Attorney General's unopposed request that this court take judicial notice of the prior appeal *Kocontes, supra,* G051809.

[3]     The prosecution began its case-in-chief on February 10, 2020.

Kanesaki told her friend Susan White that she did not trust Kocontes concerning money and fidelity.[4] Kanesaki wrote White e-mails detailing her concerns.

In 2002, Kocontes met Amy Nguyen. In July 2005, they married and moved into a house in Orange Hills. One day, Kanesaki went to their house and talked with Kocontes for over an hour—he packed his belongings and returned to Kanesaki the same day. A few days later, Nguyen moved out of the Orange Hills house. The day she moved out, Kocontes told Nguyen, "'The only way is to get rid of [Kanesaki].'" Nguyen asked "'How?'" and Kocontes replied, "'To make her silent forever.'" A few days later, Nguyen met with her lawyer and told him that Kocontes wanted to "get rid" of Kanesaki.

In September 2005, Kocontes filed for divorce from Nguyen. Nguyen believed Kocontes divorced her because Kanesaki had information that incriminated him. From the time Kocontes returned to Kanesaki in September 2005 to Spring 2006, Kocontes and Nguyen continued their intimate relationship.

At some point, Nguyen told Kocontes what she told her lawyer about him. At Kocontes's insistence and with his help, Nguyen wrote a letter to her lawyer retracting her statement. She also complied with Kocontes's order to get her file from her lawyer and give it to him.

Kocontes and Kanesaki argued about money. Kanesaki, who was financially savvy, managed their joint accounts, paid the bills, and made investment decisions. Kanesaki told Julie Saranita, her niece, Kocontes wanted to sell the house, but she did not. She was frustrated with him because he micromanaged her purchases. She did not trust him and wanted to protect her and her parents' assets. Kocontes told

---

[4]     Before White testified, the parties learned jurors disobeyed the trial court's instructions. During jury selection, after the jury was empaneled, and during trial, the court instructed jurors to not use the Internet in any way connected with the case and to not talk about the case with anyone. The court denied Kocontes's mistrial motion and request to excuse jurors. We discuss this issue on appeal below.

4

Nguyen that he was frustrated with Kanesaki because she did not want to sell their house. Kocontes said he needed to get the house from Kanesaki.

In December 2005, Kocontes and Kanesaki executed wills designating each other as sole beneficiaries. Kanesaki designated Kocontes as the sole beneficiary on her retirement account.

In April or May 2006, Kocontes told Nguyen that he was going on a cruise with Kanesaki, his friend Bill Price, and Price's life partner, Susan McQueen. Kocontes and Price met in 1993. Price was a former police officer, a former Drug Enforcement Agent, and a private investigator. They became friends, and Price considered Kocontes a brother. Kocontes shared with him intimate details about his relationships, including that he was not having sexual relations with Kanesaki and he enjoyed sexual relations with Nguyen. Kocontes, who valued money and sex, told Price that he was maintaining a relationship with Kanesaki because he did not want to lose half of his money. Price knew the 1999 allegation negatively affected Kocontes's marriage to Kanesaki and knew about a lawsuit involving Kocontes and Edward Bujanowski.

Price and McQueen were frequent cruisers. Kocontes had spoken with Price about cruise ship security, vis-à-vis, how to enter rooms, whether there were security cameras, and protecting his property.

Kocontes told Nguyen that he and Price planned to have Price's "people" throw Kanesaki in the water. Price and McQueen would be his alibi. Later, Kocontes told Nguyen that Price and McQueen were not going on the cruise and he would "have to take matters into his own hands."

b. *The Cruise*

On May 2, 2006, Kocontes, while residing in Orange County, booked a balcony room on the Island Escape cruise ship set to depart on May 23, 2006. The Island Escape was a car ferry converted into a cruise ship with pre-fabricated balcony units bolted and welded onto the ship. Kocontes's request for the Island Escape was "unusual"

5

because the ship was budget "working class cruising" marketed to the United Kingdom, not the United States. Neither the booking agent nor the ship captain could remember an American cruising on the Island Escape. The booking agent ensured Kocontes knew he was booking an entry level cruise.

On May 24, 2006, the Island Escape departed from Spain. At 6:00 a.m. on May 26, 2006, as the ship approached Naples, Italy, the captain learned Kocontes reported Kanesaki had gone missing. About 90 minutes later, the captain, a former United Kingdom constable, met with Kocontes in his cabin.

Kocontes was "very cold," "not upset at all," and gave "short" answers. Kocontes had showered, one bed had been used, a wine bottle was in the trash can, and a small bottle with tablets was on a dresser.

Kocontes told the captain what he and Kanesaki did the previous evening. They had dinner and bought a bottle of wine; they each drank one glass. They went to a show and the casino before returning to their room about midnight. He took a sleeping pill, and Kanesaki went to get tea about 12:15 a.m. The next thing he remembered was waking up at 4:30 a.m. and Kanesaki was not in the room.

The ship's crew searched for Kanesaki and informed passengers to look for 52-year-old Kanesaki. She was 5'3" tall, weighed 108 pounds, and was wearing green pants and white shoes.

The captain stated the only place to get tea after midnight was the Beachcomber, a staffed self-service buffet one level above Kocontes and Kanesaki's cabin. The captain detailed the few places where a passenger could get outside access and access to a railing other than balconies. He agreed there was no outside access other than the cabin balconies themselves. The captain said staffing at night was minimal but there were security guards, fire patrol, and cleaners. Nobody reported seeing Kanesaki after midnight on the ship, and the security camera surveillance video, which was "very basic and very poor," did not show her.

6

Kocontes called Price from the ship after Kanesaki went missing. After the ship arrived in Naples, Italy, Kocontes disembarked the ship. He called Price several more times from Italy. The next morning, he flew to Los Angeles and immediately went to Nguyen's house in Riverside. He told her that Kanesaki went overboard.

On the evening of May 27, 2006, a scientific research ship discovered Kanesaki's body off the coast of Naples, Italy. Crew members recovered her unusually intact body, and the Italian Coast Guard transported her to the police station. She was wearing green pants and a black T-shirt but was barefoot. Later, Kanesaki's friend described this outfit as uncharacteristically unfashionable for the classy Kanesaki.

*c. The Investigation*

FBI special agents Kenneth Stokes and R.W. Simpson were assigned to investigate Kanesaki's death. On May 28, 2006, Stokes first spoke with Kocontes on the telephone and then met with him in person. Kocontes had a very flat affect and was not emotional about Kanesaki. He told Stokes what he and Kanesaki did the night she disappeared, including that they finished the bottle of wine in their cabin, his efforts to find her, and what occurred after the ship arrived in Naples. Kocontes stated cruise line personnel offered to pay for two nights at a hotel in Naples, but he flew to Los Angeles on the morning of May 27.

Kocontes volunteered to disrobe for the agents to determine whether he was injured and to provide blood or urine. Kocontes said, "'If I did do something to hurt my wife, I might want to prove that I was impaired.'"

Stokes asked Kocontes what he thought happened to Kanesaki. Kocontes said they were both suffering from sea sickness and she might have felt sick, leaned over the rail to vomit, and fallen overboard because of the combined effects of the alcohol and Ambien. He said Price and McQueen were supposed to join them on the cruise, but there was a family illness. He told Stokes about the 1999 incident involving inappropriate

7

sexual conduct with a female that caused he and Kanesaki to divorce to protect their assets. Kocontes never mentioned Nguyen.

Kocontes did not inform Kanesaki's family of her death—they learned of her death from the State Department. Saranita agreed to cooperate with the FBI and record her telephone conversations with Kocontes.

During 14 recorded telephone calls from May 2006 to July 2006, Kocontes never mentioned Nguyen. A recurring theme of these conversations was Kocontes's frustration with Kanesaki's brother, Toshitaka Kanesaki (Toshitaka), because Kocontes felt his money was subsidizing Kanesaki's parents. He was also fixated on whether or not Kanesaki was wearing her wedding ring. Kocontes told Saranita she died by murder, suicide, or accident. He told her that he was not aware of any security personnel or cameras on the ship. He said that after the 1999 allegations, Kanesaki drank and became violent. Saranita and Toshitaka said this was uncharacteristic and said Kocontes exhibited offensive conduct toward Kanesaki. Kocontes and Kanesaki argued in the months preceding the cruise.

Stokes interviewed Kocontes again on June 19, 2006. The interview was recorded.

In June 2006, Dr. Pietrantonio Ricci, a forensic pathologist, criminologist, and toxicologist, performed an autopsy on Kanesaki. He was a professor and director at two Italian universities and had performed over 3,000 autopsies, including on many bodies recovered from the ocean. Kanesaki had extensive hemorrhaging on her thorax, neck, and base of her neck that occurred antemortem and was the result of strong and prolonged compressive action. Her eyes and mouth showed hemorrhaging consistent with strangulation. She also suffered antemortem blunt force trauma on her skull suggesting she was hit on the head with a round object. Ricci stated she suffered no fractures, she had not been raped, and there was no water in her lungs. Her stomach contents suggested she died shortly after she had eaten, and she had been in the water

8

about 36 to 42 hours. Ricci opined Kanesaki's manner of death was homicide caused by mechanical asphyxia through strangulation. On redirect examination, over Kocontes's objection, Ricci testified Kanesaki's blood and urine tested negative for alcohol.

When Saranita told Kocontes that she had information about the autopsy, he never asked for more information about Kanesaki being dead before she hit the water. He did not trust the Italian autopsy, thought the Italian officials were corrupt, and believed the FBI would lie and manipulate people.

After the cruise, Kocontes filed a travel insurance claim and received about $12,000. A forensic accountant opined Kocontes inherited $930,958 from various sources as a direct result of Kanesaki's death. Kocontes and Kanesaki's house sold for $636,416 on January 26, 2007, about eight months after Kanesaki's death; half of that was $318,208. The FBI eventually obtained a warrant and seized almost $1.3 million from Kocontes.

Kocontes told Nguyen that he was a suspect in Kanesaki's death and the FBI was watching them. He told her that Kanesaki went to get tea, never returned, and went overboard. He coached her on what to say to the FBI, but she did not talk to them. He told her that Price was giving him information about the FBI's investigation. Kocontes told Nguyen that he needed the hard drive from her computer before the FBI got it because he used it to research and book the cruise. He told her how to remove it, and she gave it to him. Kocontes told her that he kept the hard drive for the FBI and she would go to jail too if she reported him to the FBI.

In summer 2006, Kocontes and Nguyen met Price at a Westminster restaurant for lunch. Price showed her a badge and asked her what she knew about Kanesaki's death. Kocontes told Nguyen to not tell anyone he planned to kill Kanesaki because he would have Price's people kill her and make it appear accidental.

About the same time, Price introduced Kocontes to Frank "Mike" Brentnell. Brentnell spoke with Kocontes about his involvement in Kanesaki's death.

9

Brentnell asked him how he killed Kanesaki. Kocontes said that after he convinced her to go outside and lean over the rail, he grabbed her by the ankles and threw her overboard. Brentnell did not consider the remark to be humorous and could not remember whether Kocontes said he was joking. Brentnell described him as "pretty cocky" and merciless. Brentnell was to share what Kocontes said to him only with Price. A couple years later, Brentnell had financial difficulties and borrowed $50,000 from Kocontes. When Kocontes feared the government was going to freeze his assets, Brentnell helped him wire $48,000 to his brother, and Kocontes forgave the loan.

In July 2006, Kocontes arranged for his then attorney, Jennifer Keller, to conduct a recorded interview with Nguyen. Kocontes coached Nguyen on what to tell Keller to portray him in a positive light. Nguyen wanted to help and protect Kocontes.

In December 2006, Nguyen testified to a federal grand jury pursuant to a subpoena. Nguyen testified consistent with what Kocontes told her to say and what she previously told Keller. Nguyen testified falsely their marriage ended because Kocontes caught Nguyen committing adultery with her ex-boyfriend. Kocontes did not want it known he returned to Kanesaki because she had evidence that incriminated him. Nguyen lied to protect him, she was afraid, and she hoped they could get back together.

In January 2009, McQueen and Price went to Nguyen's house to speak with her. Kocontes had hired McQueen, who was also a private investigator, not Price, as his investigator. Price was not his investigator so he could be his expert witness. Kocontes asked McQueen to meet with Nguyen without his attorney's knowledge. Nguyen was hesitant to speak with them, but McQueen called Kocontes and he told Nguyen that she could speak with them. They went to a public location. McQueen spoke with Nguyen privately before Price joined the discussion. Price told Nguyen they were recording the conversation for his protection.[5] Nguyen stated that before the cruise, Kocontes told her

---

[5] The recording was played for the jury.

that Price knew people who could throw Kanesaki overboard.[6] She also said Kanesaki had evidence Kocontes misappropriated money from his former law firm, and he destroyed the hard drive from her computer. Price was surprised, angry, saddened, and concerned to hear Kocontes implicated him in Kanesaki's death.

Later, Price confronted Kocontes about Nguyen's statement implicating him in Kanesaki's death. Kocontes told him to not worry because Nguyen had already untruthfully testified to the federal grand jury she knew nothing about Kanesaki's death and thus she was not credible. Kocontes also told Price that he destroyed the hard drive. Price told Kocontes that he was going to give the recording to the FBI.

Price first met with the FBI shortly after the cruise in July 2006 and again in 2008. From November 2008 through May 2011, Price spoke with Simpson nine times. Price shared information Kocontes gave him with Simpson, and he shared information Simpson gave him with Kocontes. When Price spoke with the FBI, he told Kocontes. In fact, Price spoke to the FBI at Kocontes's direction. Price never received renumeration or accolades, and claimed his testimony was truthful. Price testified Kocontes did not ask him to hire someone to kill Kanesaki.

In December 2012, the investigation transitioned from the FBI to the Orange County Sheriff's Department (OCSD). Nguyen initially would not cooperate with the county investigation.

In 2013, Nguyen was subpoenaed to testify before the Orange County Grand Jury. When Nguyen went to the Orange County District Attorney's Office, the prosecution arranged to have Price speak to her alone first; their conversation was recorded.

---

[6]     This was the first time Nguyen disclosed what Kocontes said Price's "people" would do to Kanesaki on the cruise.

At the prosecution's behest, Price asked Nguyen to tell the truth and told her that he gave the prosecution the recording of their 2009 conversation. Nguyen, "scared to death" to see Price, initially acted like she did not know him but eventually acknowledged they had met. Price told her that Kocontes was not who he was pretending to be, he called her a "whore," and he was trying to get McQueen in trouble. Nguyen said she wanted to hear the recording before she spoke to the prosecution. She also asked for assurances to be protected from Kocontes and for confidentiality. Her overarching concern was Kocontes would harm her. After she heard the recording and was assured she would get a protective order, she cooperated.

Nguyen told the prosecution about Kocontes's pre-cruise statement he planned to murder Kanesaki on the ship. Other than Price and McQueen, she had never told anyone this because Kocontes threatened her and told her not to tell anyone. A trial judge issued an order protecting Nguyen from Kocontes. Nguyen later stated Kocontes did not threaten her after the cruise; she lied to the federal grand jury because she wanted to help him. Later though she added Kocontes threatened she would go to jail if she did not lie to the federal grand jury.

Nguyen agreed she did not tell Kocontes's former attorney, the federal grand jury, Price and McQueen, Orange County law enforcement, or the Orange County Grand Jury that Kocontes stated he would "have to take matters into his own hands" when Price and McQueen backed out of the cruise. Nguyen's immunity agreement with the prosecution required her to testify truthfully.

2. *Defense Case*[7]

The funeral home coordinator testified Kocontes was "extremely upset" and crying when he viewed Kanesaki's body. A certified public accountant testified the

---

[7]     On March 9, 2020, the trial court denied Kocontes's motion for judgment of acquittal pursuant to section 1118.1. Kocontes began offering evidence on March 9, 2020.

12

prosecution expert's analysis was incomplete and thus his opinion Kocontes benefitted financially from Kanesaki's death was flawed.

A forensic pathologist and neuropathologist reviewed Kanesaki's autopsy report and other documents and testified there was "evidence to indicate that there [was] a more reasonable cause of death than strangulation." She agreed Kanesaki's injuries were consistent with hitting a surface or structure at high velocity. She added Kanesaki's injuries were consistent with being thrown or falling from one deck to another deck and then being thrown or falling into the water. She agreed Kanesaki did not drown, she was dead before she hit the water, she was not raped, and there was food in her stomach.

Kocontes offered two more witnesses on March 11, 2020. His sister-in-law stated she previously drank herbal tea with Kanesaki and once heard her use profanity after drinking wine. After Kanesaki went missing, she heard Kocontes sound "sad" and "scared" when talking with his brother. The trial court and counsel discussed jury instructions and rebuttal witnesses.

The following day, March 12, 2020, the trial court addressed Kocontes's request to revisit the *Massiah* issue and ruled there was no Sixth Amendment violation. The trial court noted they were in the beginning stages of the coronavirus disease 2019 (COVID-19) pandemic. The court described the courtroom and how it planned to conduct the remainder of the trial while trying to ensure the health of all courtroom users. The court recessed until Monday, March 16, 2020.

a. COVID-19 Pause

On Monday, March 16, 2020, the trial court noted the COVID-19 pandemic presented a health risk and proposed "tak[ing] a break until April 6[, 2020]." The prosecutor, Kocontes's trial counsel, Denise Gragg (Gragg), and Kocontes did not object. When jurors returned, the court informed them the matter was paused until April 6 and admonished them to not do any independent research, read any articles about the case, discuss the case with anyone, or form any conclusions about the case.

13

*b. Post-COVID-19 Pause*

The trial court and counsel returned to the courtroom 10 weeks later on Tuesday, May 26, 2020. The trial court denied Kocontes's motion for a mistrial. Testimony resumed two days later with Kocontes on the stand.

*i. Direct Examination*

Kocontes testified about his relationship with and marriage to Kanesaki and revealed intimate details about her physical and mental state that portrayed her negatively. He described their financial status, including real estate investments they made with Toshitaka. After about six years of marriage, they divorced in 2002 to preserve assets against potential civil liability and because she was uninterested in having an intimate relationship with him. They separated all their assets equally with the exception of the home in Ladera Ranch and retirement accounts. They continued to live together, and after about one year, they commingled their assets. In 2003, Kocontes paid the remaining mortgage on the Ladera Ranch home from money he inherited from his father.

Kocontes met Nguyen in early 2002, and they married on July 9, 2005. He and Kanesaki were cordial and spoke weekly, but they disagreed about what they were going to do with the house. He frequently argued with Nguyen about money and him talking to Kanesaki.

Kocontes decided to end his marriage with Nguyen when he learned she cheated on him; this was a few days before he moved out. He and Kanesaki agreed to reconcile and remarry in November 2006. Kocontes denied embezzling money from his prior law firm and denied telling Nguyen that he did so. He also denied telling Nguyen that Kanesaki had paperwork incriminating him. Kocontes never told Nguyen that he was going to kill Kanesaki, never threatened Nguyen, and played no role in Nguyen's recantation letter to her attorney.

14

In December 2005, Kocontes and Kanesaki executed wills designating each other as sole beneficiaries before traveling to Florida.  Kocontes again revealed intimate details about Kanesaki's physical and mental state that portrayed her negatively during January 2006.  Kocontes shared some of these details with Price, who suggested they go on a cruise.  Kocontes wanted to make sure there was "a certain level of security," and Price said he did not have to worry because cruise ships had key cards and security cameras.  He never told Price that he returned to Kanesaki for financial reasons and never asked Price to have people throw Kanesaki overboard.

Kocontes and Kanesaki researched cruises.  He never used Nguyen's computer to research or book the cruise, never told her that he was going on a cruise, and never said he was going to "tak[e] anything into [his] own hands."  Kocontes and Kanesaki picked the casual cruise because of the ports, the price, and the dates.  Kocontes booked a balcony room because he was trying to impress Kanesaki and "didn't want to cheap out."

Kocontes detailed what he and Kanesaki did on May 25, 2006.  At 8:30 p.m., they had dinner and bought a bottle of wine: they each drank one glass.  After going to the casino and a comedy show, they returned to their cabin about midnight and finished the bottle of wine.  Kocontes took an Ambien, and Kanesaki went to get herbal tea.  When Kocontes woke up about 4:30 a.m., Kanesaki was not in the room and her bed was made.  He searched the ship and notified the ship's staff.   He recounted his interactions with the ship's staff, including the cruise line's Italian liaison, the efforts to locate Kanesaki, talking to the Italian police, his inability to get any answers, and his decision to get off the ship and remain in Naples.  He decided to fly home because someone from the American consulate said it was unlikely they would find Kanesaki's body, and he was having difficulty communicating with Italian officials.

15

Kocontes paid for transporting Kanesaki's body to the United States and her funeral; he wanted to be buried next to her. Kocontes said he inherited $150,000 from Kanesaki, and he was worth about $1.75 million at the time of her death.

Kocontes explained the day he returned to the United States he spoke to Price on the telephone. Price stated he needed investigators to know what happened to Kanesaki. Price told Kocontes to hire McQueen because his FBI contacts would not talk to him if Kocontes retained him. Price said, "I'll run the investigation and both of us will do it" but Kocontes should retain McQueen on paper. Kocontes said Price came to California about a week later and they met with Nguyen. Price showed her a badge and jokingly threatened her; Kocontes did not say anything.

Kocontes provided a timeline of Price's investigative work for him. He hired Price the day he returned from the cruise, and Price worked through August 2006. In June 2006,[8] Kocontes hired Keller and Kay Rackauckas after Stokes interviewed him. When Kocontes hired them, he "made [it] clear" Price and McQueen were his investigators. In August 2006, Keller, Rackauckas, Price, and McQueen took the same cruise Kocontes and Kanesaki took.

When the "FBI" seized his assets in November 2008, Kocontes hired attorney Mark Werksman to represent him. Price and McQueen started investigating again, and they worked through 2010. Kocontes paid Price with cash, and McQueen invoiced him and he paid her separately. Kocontes estimated he paid Price "over a couple hundred thousand dollars" for investigative work during this period of time.

In June 2011, Kocontes gave Price $6,000 to go to Italy as evidenced by a document that stated he had paid him $112,000 for investigative work since December 2010.

---

[8] Kocontes testified it was June "2005," but we think he simply misspoke. He and Kanesaki went on the cruise in May 2006, and Stokes interviewed him in May and June 2006.

Kocontes stated Price introduced him to Brentnell in summer of 2006. After Kocontes told him what happened on the cruise, Brentnell asked him how he killed Kanesaki, and he "sarcastic[ally]" said he grabbed her ankles and "flipped her" overboard. The following year, at Price's behest, Kocontes loaned Brentnell $50,000. Kocontes said Brentnell subsequently threatened to report him to the FBI if he did not deem the loan a gift.

Kocontes explained how he moved about $1.5 million overseas to protect it for his then wife Katherine Kern before the FBI seized it in November 2008. Kocontes asked Price about extradition laws after the FBI seized his money. McQueen and Price started investigating for him again and spoke to Nguyen. He never told Nguyen not to speak to the FBI, what to say to his attorney, or how to testify to the federal grand jury. He never threatened her physically or implicated her in Kanesaki's death. He told Nguyen to bring her computer and hard drive because she called him and asked if he could fix it. He never told her to destroy or discard it.

*ii. Cross-examination*

The prosecutor questioned Kocontes about his relationships with Kanesaki and Nguyen, his employment, and finances. The prosecutor turned to his in-custody conduct.[9] Kocontes denied he talked to Anthony King, his cellmate, about paying Nguyen to change her testimony. He denied he offered to pay Maverick Semanu, his former cell mate, to kill Nguyen. He said King and Semanu lied to get favorable treatment from the prosecution.

Kocontes stated King told him that "Greg" was an investigator and real estate broker and to use real estate language because jailers were listening to their telephone calls. Kocontes said he wanted Greg to interview Nguyen and determine why she was lying about him. Kocontes agreed he and King wrote notes to each other. He

---

[9] As we explain below, the prosecution cross-examined Kocontes regarding his in-custody conduct over Gragg's objection.

17

also agreed he arranged for Greg to get audio recordings from Dropbox via his attorney friend Maha Kasim.

The prosecutor asked Kocontes to read a declaration he wrote while he was in jail concerning Price. In the declaration, Kocontes wrote that when he and Nguyen met Price for lunch shortly after the cruise, Price told Nguyen that if she ever alleged Kocontes threatened anyone, he would have two of his people "'take care of'" her and make it look like an accident. Kocontes interpreted Price's statement as a threat, but he did not think Price was serious. This occurred before Nguyen met with Kocontes's attorney and testified to the federal grand jury.

The prosecutor questioned Kocontes about a draft affidavit he wanted Greg to give to Nguyen and a script for Greg to use to talk to Nguyen. Kocontes described it as an outline he wanted Nguyen to complete because he felt Price was pressuring her to lie about him and he wanted her to tell the truth.

Kocontes admitted he told Brentnell he grabbed Kanesaki's ankles and flipped her overboard. He claimed he was being sarcastic. The prosecutor played an audio recording between Kocontes and McQueen from April 2009, exhibit No. 158. On the recording, Kocontes stated it was his understanding that McQueen would hold the $50,000 until after trial or Brentnell would testify he confessed to murdering Kanesaki. Kocontes said he never spoke to Brentnell directly about such a deal, and the money was for Kocontes's brother.

The prosecution played recordings from a device concealed in Kocontes and King's jail cell during June 2014. These included the following exhibits: exhibit No. 160; exhibit No. 162; exhibit No. 163; exhibit No. 164; exhibit No. 167; exhibit No. 168; exhibit No. 169; and exhibit No. 170. When asked, Kocontes stated King suggested they used coded language to discuss Kocontes's effort to convince Nguyen to tell the truth. They spoke in terms of a real estate transaction. During these eight recordings, King did not ask Kocontes about the charged offense.

18

The prosecution also played the following recorded telephone calls between Kocontes and Kasim: exhibit No. 161; exhibit No. 165; and exhibit No. 166. When asked, Kocontes agreed that at some point he realized King and Greg were working with law enforcement.

On redirect examination, Kocontes denied telling King that he was responsible for Kanesaki's death or that he wanted to harm or kill Nguyen. He wanted to relay information to Nguyen so she would know Price was lying to her and not to intimidate her. Kocontes stated he and King agreed to refer to Nguyen as "T" because she was a teacher. He spoke to Greg in terms of a real estate transaction. He realized King and Greg were lying to him in August 2014.

During a break in Kocontes's cross-examination, Gragg stated she would have additional witnesses, some of whom were out-of-state. Gragg said the prosecution requested to present rebuttal witnesses out-of-order when Kocontes finished testifying. Gragg stated, "I actually don't have a problem with that so long as it's clear that the defense is not resting."

## 3. *Prosecution Rebuttal*[10]

The prosecutor called King in rebuttal. In early 2014, King met Kocontes in jail. King was a career criminal who was in jail for two felonies. In March 2014, Kocontes told King that he would pay him $100,000 to help him get a witness in his murder case to recant and if she would not, kill her—it was a "tiered" system of action. Kocontes asked if he knew anyone who could help with the job, and King said somebody he "ran with on the streets" could help. King told Kocontes about his extensive criminal history and substance abuse issues. Kocontes wanted King's cellmate, Semanu, to help King because Semanu had gang affiliations. Kocontes said Nguyen's son was a gang

---

[10] During rebuttal, Gragg requested Kocontes be permitted to cross-examine the prosecution's rebuttal witnesses. Gragg noted Kocontes was a lawyer who was representing himself in the solicitation case. The trial court denied the request.

member and if anything happened to her it could be attributed to gang-related violence. King "believe[d]" Kocontes told him that the cruise ship did not have any security cameras.

For about three weeks, Kocontes and King used coded language to plan to get Nguyen to recant. Kocontes would pay Nguyen $2,000 to change her testimony and sign a recantation letter that could be notarized and used in court.

King began to grow concerned for himself and Semanu. King spoke to his attorney.

In April 2014, King spoke to Detective Don Voght and others with his attorney present. King told detectives about Kocontes and what he was asking King to do; he did not ask for any favors.[11]

King reported Kocontes said he researched Italy's extradition laws. He said Kocontes learned most cruise ship employees were felons and would likely be accused of committing a crime. He stated Kocontes told him that he paid someone to help him kill Kanesaki. Detectives twice advised King not to question Kocontes about Kanesaki's murder, but if Kocontes talked about it, he could listen.

King signed a letter agreeing to provide a truthful statement and an offer of leniency in exchange for his testimony. King's sentence was reduced from 12 years to eight years and eight months, the time he had served when he testified.

Kocontes was placed into King's cell, and unbeknownst to King, their conversations were recorded. King spoke with law enforcement about their conversations and gave them documents he got from Kocontes. Kocontes often communicated with King in writing because he was worried their conversations were being recorded. He let King keep some of their written communications and flushed others down the toilet.

---

[11]     After this meeting, Voght met with Nguyen.

20

King agreed he told detectives "D16" was code for death and was based on section 187 (the digital sum of 187). Kocontes would not say D16, but he would write it down. During a telephone call, Kocontes would say "D," which meant death.

When the prosecutor asked King what research Kocontes did before the cruise, King stated, "Well, he knew -- he was aware of their extradition laws in Italy, so that's why he said when -- afterwards, he immediately left the ship and went back -- came back to the [United] States." King added, "He said he called another lawyer or . . . Price. I don't know which one he said. One of them he called. And the next day, he informed him you need to get on the next plane out of there, so when they get to the next port, he got out of there and went back to the United States." Kocontes also learned that about 20 percent of cruise ship workers were convicted felons. Kocontes told King that he needed to get rid of Nguyen's hard drive and there was a Dropbox file that contained a lot of information. He told King he was going to hire a male to go on the cruise and facilitate Kanesaki's murder. Kocontes told King that when he returned from Italy he stayed with Nguyen and told her about the cruise. He was concerned Nguyen would tell detectives that he forced her to recant. Kocontes talked to King about Price and was concerned Price would tell Nguyen to tell the truth. Kocontes asked King to instill fear in Nguyen where she worked and lived.

At some point, King told Kocontes that he was not going to work with Semanu and connected Kocontes with a person named "Greg," who, unbeknownst to Kocontes, was OCSD investigator William Beeman. King never told Kocontes that Greg was an investigator.

Beeman testified he had seven recorded telephone conversations with Kocontes from July 19, 2014, to September 15, 2014, because Kocontes wanted Beeman, who he thought was Greg, to do something for him. Beeman never talked to Kocontes about his underlying murder charge; he was investigating whether Kocontes was committing a different crime. Kocontes never asked Greg about his background or

21

qualifications, never claimed Greg was his investigator, and never retained Greg to investigate. Beeman spoke with King 10 times on the telephone, and he met with Kasim three times at her restaurant in Northern California. Kasim gave Greg $500 to give to Nguyen to change her testimony.

The prosecution played recordings of the some of Kocontes's telephone calls with Beeman.[12] Beeman stated he spoke to Kocontes in real estate terms as code.

During the first call, Beeman stated he met with Kasim who gave him $500. He was supposed to give the money to Nguyen to change her testimony. During another call, Kocontes told Beeman to get Dropbox audio files from Kasim; she eventually e-mailed him the files, which he forwarded to Voght. During another call, Kocontes made a statement to Beeman about keeping "the property off the market, so to speak . . . ." Beeman never told Kocontes that he was involved in real estate. During another call, Kocontes told Beeman to return the $500 to Kasim. During the last call on September 15, 2014, Kocontes told Beeman that he wanted Nguyen to tell the truth. Beeman believed that his relationship with Kocontes had changed. During these four telephone calls, Beeman did not question Kocontes about the charged offense.

Voght conducted eight recorded interviews with King and his attorney. Voght repeatedly advised King to not "ask or elicit any information from [Kocontes] regarding the current homicide case he was currently in trial for." Voght said the solicitation investigation had nothing to do with the murder case. King provided Voght documents that Kocontes gave him.

---

[12] Kocontes references exhibit No. 184a, a call on August 18, 2014. Exhibit No. 184a was actually a call on August 9, 2014. The clerk's transcript has a face page for this exhibit in volume 24, page 6134. However, there is no transcript of the August 9, 2014, call. The next page, 6135, is the face page for exhibit No. 185a. Exhibit No. 185a is the transcript of the August 18, 2014, call.

## 4. Defense Case Resumes

Kocontes offered additional witnesses, including a defense investigator who interviewed King in July 2019. The investigator testified King stated Kocontes did not want Nguyen killed and he did not believe she would be hurt. King never heard Kocontes say he had Kanesaki killed. King told the investigator that he lied when he previously told detectives that Kocontes admitted he had Kanesaki killed. He said Kocontes never used "D16" to mean murder. King told the investigator he thought the prosecution would offer him a deal from the beginning. King told the investigator about his lies because he had a conscience and he had already served his time so no one could do anything to him.

## 5. Prosecution Rebuttal

The Orange County Coroner chief forensic pathologist reviewed Kanesaki's autopsy report and photographs. He agreed with Ricci that Kanesaki was strangled and did not drown or sustain her injuries from an accidental fall.

## 6. Defense Surrebuttal

McQueen, testifying remotely, stated Kocontes hired her to be his investigator concerning Kanesaki's death. When asked about her April 2009 conversation where Kocontes asked if she had the $50,000 for Brentnell to stop him from testifying against Kocontes, McQueen said she believed "the conversation . . . was orchestrated for an entirely different purpose." She did not remember holding $50,000 for Kocontes.

Price, also testifying remotely, stated he did not hold $50,000 for Kocontes or talk to McQueen about holding $50,000 for Kocontes to pay Brentnell not to testify. At the 2006 lunch in Westminster, Price paid Nguyen money from Kocontes to testify consistent with her December 2006 federal grand jury testimony.

23

Kocontes testified he inherited a large sum from his father, which he transferred to his joint account with Kanesaki and paid off their mortgage. With respect to Greg, Kocontes became concerned Greg did not understand his intentions and their relationship ended. He wanted Nguyen to feel safe from Price and realize it was okay to tell the truth. He said King suggested they use real estate terms to discuss the investigative tasks he wanted done. He added "D16" meant "all of the investigative work that [he] wanted done . . . ." Kocontes testified he did not participate in any plot to have Nguyen killed, and he "absolutely did not kill" Kanesaki.

## C. Verdicts, Sentencing & Motions

The trial court instructed the jury, and counsel offered closing argument. Kocontes was convicted of first degree murder for financial gain. Kocontes filed a postverdict motion to relieve his counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) and a supplement to that motion. He also filed a motion for new trial. The trial court denied both motions. The court sentenced Kocontes to prison for life without the possibility of parole.

## DISCUSSION

## I. Pretrial

Kocontes raises procedural claims concerning the accusatory pleading and territorial jurisdiction. We address them in turn.

## A. Accusatory Pleading

Kocontes asserts four procedural claims concerning the accusatory pleading and the prosecution's timeliness in electing remedies. Three of these contentions are barred by the law of the case doctrine, and the fourth is meritless. The following facts are taken from our prior nonpublished opinion *Kocontes, supra,* G051809.

24

*1. Background*

*a. Orange County Superior Court Case No. 13CF0463*

In February 2013, a complaint charged Kocontes with murder for financial gain in *People v. Kocontes* (Super. Ct. Orange County, 2013, No. 13CF0463 (case No. 13CF0463)). Kocontes filed demurrers and nonstatutory motions to dismiss alleging lack of territorial jurisdiction. A first amended complaint (FAC) charged Kocontes with the same offense and added that he committed preliminary acts in Orange County that culminated in the offense outside of California. At a hearing, Judge Kazuharu Makino overruled Kocontes's demurrer to the FAC and declined his request to consider his motion to dismiss for lack of territorial jurisdiction.

Judge William Lee Evans arraigned Kocontes—he waived his right to have his preliminary hearing within 10 days of his arraignment. In May 2013, there was a hearing before Judge Evans on Kocontes's motion to dismiss for lack of territorial jurisdiction. Noting he was sitting as a magistrate, Judge Evans granted Kocontes's motion to dismiss for lack of territorial jurisdiction. Judge Evans granted the prosecution a short recess.

*b. Orange County Superior Court Case No. 13CF1773*

During the recess, the prosecution filed a second complaint (second complaint) charging Kocontes with murder for financial gain in *People v. Kocontes* (Super. Ct. Orange County, 2013, No. 13CF1773 (case No. 13CF1773)). When court resumed, Judge Evans ordered Kocontes released in case No. 13CF0463. When Judge Evans began arraigning Kocontes in case No. 13CF1773, Kocontes moved to dismiss the second complaint on the same grounds. Later that afternoon, Judge Evans denied Kocontes's motion to dismiss the second complaint and remanded him, and granted his motion to continue his arraignment.

25

*c. Orange County Superior Court Case No. 13ZF0163*

The following month, the grand jury heard testimony and returned a true bill of indictment alleging murder for financial gain with the jurisdictional allegation. Judge Prickett ordered the indictment filed in *People v. Kocontes* (Super. Ct. Orange County, 2013, No. 13ZF0163 (case No. 13ZF0163).)  At a hearing, Judge Prickett granted the prosecution's motion to dismiss case No. 13CF1773.  Later, at another hearing, Judge Prickett indicated he had read and considered the demurrer and motions to strike and dismiss the indictment, and counsel argued.  Judge Prickett stated he would issue a written opinion.

On July 25, 2013, eight weeks after Judge Evans's ruling, the Orange County District Attorney (OCDA) appealed from the order granting Kocontes's motion to dismiss case No. 13CF0463, which became case No. G048763 on appeal.  Days later, Judge Prickett issued a written order overruling the demurrer and denying the motions. In September 2013, this court summarily denied Kocontes's petition for writ of habeas corpus, mandate, and/or prohibition and request for immediate stay of Judge Prickett's ruling.  (*Kocontes v. Superior Court, supra,* G049056.)

Judge Lance Jensen, sitting in department C5, arraigned Kocontes on the indictment on November 8, 2013.  Kocontes pleaded not guilty and denied the allegation. Judge Jensen assigned the case to Judge Stotler.  More pretrial litigation and writ proceedings ensued for about the next year.

In early October 2014, the OCDA filed a notice of abandonment of its appeal of Judge Evans's ruling in case No. G048763.  This court dismissed the appeal. (*People v. Kocontes, supra,* G048763.)

In December 2014, Kocontes filed a petition for writ of habeas corpus, mandate, and/or prohibition alleging collateral estoppel barred Judge Prickett from reconsidering Judge Evans's ruling.  This court summarily denied the petition. (*Kocontes v. Superior Court, supra,* G051135.)

In January 2015, Kocontes filed a petition for writ of habeas corpus in the California Supreme Court arguing Judge Prickett erred by overruling his demurrer and denying his motion to dismiss the indictment because collateral estoppel prevented him from reconsidering Judge Evans's ruling granting his motion to dismiss. After additional informal briefing, our Supreme Court issued an order to show cause before this court. The OCDA filed a return and exhibits, and Kocontes filed a traverse and accompanying exhibits. This court denied Kocontes's habeas corpus petition. (*Kocontes, supra,* G051809.) We did not address his election of remedies claim because it was not properly before this court. (*Ibid.*)

2. *Law and Analysis*

a. *Kocontes, supra,* G051809

Failing to anticipate the Attorney General's assertion the law of the case doctrine applies, Kocontes raises three arguments that he raised in his habeas corpus petition. First, he argues the OCDA's sole remedy was to appeal Judge Evans's ruling granting the motion to dismiss in case No. 13CF0463 and not to refile in case No. 13CF1773. Second, he contends Judge Prickett lacked jurisdiction to revisit Judge Evans's ruling. Third, he asserts the OCDA's appeal in case No. 13CF0463 deprived Judge Prickett of jurisdiction to rule on the matter. We previously rejected these claims in *Kocontes, supra,* G051809.

"'The law of the case doctrine states that when, in deciding an appeal, an appellate court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular." [Citations.]' [Citation.] The doctrine 'can apply to pretrial writ proceedings. When the appellate court issues an alternative writ, the matter is fully briefed, there is an opportunity for oral argument, and the cause is

27

decided by a written opinion. The resultant holding establishes law of the case upon a later appeal from the final judgment.' [Citation.]" (*People v. Alexander* (2010) 49 Cal.4th 846, 870 (*Alexander*).)

As we explained in *Kocontes, supra,* G051809, "section 1387 did not prohibit the prosecution from either filing the second complaint or obtaining an indictment and seeking dismissal of the second complaint." The OCDA's sole remedy was not an appeal. The OCDA "was permitted to proceed first on the second complaint and then on the indictment after dismissal of the second complaint." (*Ibid.*) Additionally, while we acknowledged one superior court judge may not overrule another superior court judge (*People v. Goodwillie* (2007) 147 Cal.App.4th 695, 713), "Judge Prickett did not overrule Judge Evans because they presided over different causes." (*Kocontes, supra,* G051809.) Finally, we held sections 1387 and 1238 permitted the OCDA to obtain an indictment while the appeal was pending in case No. G048763 and "[a]cceptance of Kocontes's theory would render the election of remedies provision meaningless." (*Kocontes, supra,* G051809.)

In his reply brief, Kocontes asserts the law of the case doctrine does not apply, and if it does, it should not be adhered to because its application results in an unjust decision. We do not consider arguments raised for the first time in a reply brief. (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583 (*Nordstrom*).) Kocontes was well aware of our decision in *Kocontes, supra,* G051809, having cited to it in his opening brief. Nevertheless, his claims are meritless.

First, Kocontes's attempt to read *Kocontes, supra,* G051809, as narrowly as possible, i.e., collateral estoppel did not apply, is meritless. In reaching our conclusion, we decided other legal issues described above. (*People v. Shuey* (1975) 13 Cal.3d 835, 842 [law of case doctrine concerned exclusively with issues of law], disapproved on other grounds in *People v. Bennett* (1998) 17 Cal.4th 373, 389, fn. 5.)

28

Second, the unjust decision exception to the law of the case doctrine is inapplicable. "Because the law of the case doctrine 'is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a "manifest misapplication of existing principles resulting in substantial injustice" [citation], or the controlling rules of law have been altered or clarified by a decision intervening between the first and second appellate determinations [citation]. The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination.' [Citation.]" (*People v. Gray* (2005) 37 Cal.4th 168, 197 (*Gray*).)

Kocontes asserts the majority decision in *Kocontes, supra,* G051809, manifestly misapplied existing principles resulting in substantial injustice in two respects. First, he faults the majority for failing to discuss *Casey v. Superior Court* (1989) 207 Cal.App.3d 837, the case relied on by the dissent. In *Casey,* the court held a dismissal for lack of territorial jurisdiction does not constitute a dismissal in the furtherance of justice under section 1385. (*Id*. at p. 844.) Although the majority opinion did not discuss *Casey,* its reasoning is an implicit rejection of *Casey,* and Kocontes merely asserts a disagreement with its rationale.

Second, Kocontes asserts counsel in *Kocontes, supra,* G051809, failed to argue dismissal on due process grounds was not within the scope of section 1387 and thus it must be appealed, not refiled. (See *People v. Aguilera* (2020) 50 Cal.App.5th 894, 910; *People v. Pinedo* (2005) 128 Cal.App.4th 968, 973.) The unjust decision exception is inapplicable because this claim was not raised in *Kocontes, supra,* G051809, and therefore, there was no misapplication of existing principles in that case. Kocontes cites to no alterations or clarifications of these principles between *Kocontes, supra,* G051809, and this appeal. Thus, the law of the case doctrine prohibits Kocontes from relitigating these three issues. (*Gray, supra,* 37 Cal.4th at p. 199.)

*b. Timely Election of Remedies*

Relying on *Anderson v. Superior Court* (1967) 66 Cal.2d 863 (*Anderson*), Kocontes argues the OCDA failed to timely elect between maintaining the appeal in case No. 13CF0463 or proceeding on the indictment. We disagree.

In *Anderson, supra,* 66 Cal.2d at page 864, immediately after the order dismissing the indictment under section 995, the prosecution appealed. Two weeks later, while the appeal was pending, the trial court held a hearing to determine if an information could be filed against defendant. (*Ibid.*) After a preliminary hearing, the court held defendant to answer, the prosecution filed an information, and the court set the matter for trial. (*Ibid.*) Prior to the jury being sworn, the court inquired whether it had subject matter jurisdiction due to the pending appeal. (*Ibid.*) Defendant filed a writ petition on the jurisdictional issue, arguing he should not be compelled to defend the appeal and simultaneously prepare for trial. (*Id.* at p. 865.)

Our Supreme Court, characterizing section 1238 as an "important right" of the prosecution, stated, "[t]he [prosecution] may simultaneously file an appeal from the dismissal of the first pleading and seek a new accusation." (*Anderson, supra,* 66 Cal.2d at p. 864.) The court added, however, the prosecution must elect between the two remedies "to foreclose the possibility of harassment of the defendant, and to that end the [prosecution] should elect as soon as feasible between maintaining the appeal or proceeding under the new accusatory pleading. At the latest, this election should occur either when the new accusatory pleading withstands a motion under section 995 or at the time of arraignment for plea, whichever first occurs. We thereby assure the [prosecution] an opportunity to obtain a valid accusatory pleading on which to go to trial, yet also guarantee that the defendant will not be called upon to defend an appeal and at the same time a trial on the basis of a second accusation, both resulting from the same alleged crime." (*Id.* at p. 867.)

Judge Evans ruled on May 31, 2013. Judge Prickett ordered the indictment filed on June 14, 2013. On July 25, 2013, the OCDA appealed from Judge Evans's ruling—eight weeks after Judge Evans's ruling and six weeks after obtaining the indictment. Kocontes was arraigned on the indictment on November 8, 2013, and Judge Stotler denied his motion to set aside the indictment under section 995 on August 4, 2014. The OCDA moved to dismiss its appeal on October 3, 2014, about 11 months after the trial court arraigned Kocontes.

The Attorney General concedes the OCDA did not comply with *Anderson's* election of remedies timeline but asserts the timeline was dicta, he did not force an election, and its election rendered Kocontes's claim moot. We agree with the Attorney General. *Anderson* concerned whether the prosecution must make an election and suggested a time frame for making an election. Indeed, the court stated the prosecution "*should* elect as soon as feasible." The suggested time frame was dicta. Additionally, Kocontes never objected in the trial court and requested the OCDA make an election. Finally, he cites to no authority, and we found none, holding the prosecution's delay constitutes reversible error. Thus, his claim is meritless.

## B. Territorial Jurisdiction

Citing to California statutory law and the federal constitution, Kocontes contends the Orange County Superior Court did not have jurisdiction over crimes committed on the high seas. We address his contentions in turn.

## 1. Background

At the June 17, 2013, hearing where Kocontes was to be arraigned, Judge Prickett stated he would consider Kocontes's demurrer and motions to strike and dismiss from case No. 13CF1773.[13] A few days later, the prosecution opposed Kocontes's demurrer and motions. Despite Judge Prickett's agreement he would consider

---

[13] These motions are not part of the record on appeal.

31

Kocontes's prior written submissions, Kocontes filed another demurrer, motion to strike the indictment, and motion to dismiss the case, a reply, and a supplemental memorandum.

At a hearing on June 26, 2013, Judge Prickett indicated he had read and considered the moving papers and counsel argued the motion. Judge Prickett stated he intended to issue a written opinion. A few weeks later, the prosecution filed a supplemental brief, and Kocontes filed a reply.

In his July 29, 2013, order, Judge Prickett concluded the Orange County Superior Court had jurisdiction over crimes committed on the high seas pursuant to section 778a, subdivision (a). Additionally, Judge Prickett concluded the United States and California had concurrent jurisdiction to prosecute the charged offense.

Several months later, the matter was assigned to Judge Stotler for all purposes. Kocontes filed inter alia a motion to dismiss for lack of territorial jurisdiction, which spawned voluminous additional briefing. The motion trailed for a few years. After the matter was reassigned to Judge King, Kocontes again filed a motion to dismiss for lack of territorial jurisdiction. At a hearing on the motion, Judge King denied the motion on the grounds Judge Prickett previously ruled on it.

2. *Law and Analysis*

a. *Section 778a*

Kocontes asserts section 778a did not confer jurisdiction to the Orange County Superior Court for a murder committed on the high seas because the crime must be committed in another state. Not so.

"This [issue] poses a pure question of statutory interpretation, subject to independent review. [Citation.] 'Our fundamental task is to determine the Legislature's intent and give effect to the law's purpose. [Citation.] We begin by examining the statute's words "'because they generally provide the most reliable indicator of legislative intent.' [Citation.] If the statutory language is clear and unambiguous our inquiry

32

ends."'  [Citation.]  In that case, the plain meaning of the statute is controlling, and "'resort to extrinsic sources to determine the Legislature's intent is unnecessary.'" [Citation.]"  (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 633-634.)

Section 778a provides as follows:  "(a) Whenever a person, with intent to commit a crime, does any act within this state in execution or part execution of that intent, which culminates in the commission of a crime, either within or without this state, the person is punishable for that crime in this state in the same manner as if the crime had been committed entirely within this state.  [¶]  (b) Whenever a person who, within this state, kidnaps another person within the meaning of [s]ections 207 and 209, and thereafter carries the person into another state or country and commits any crime of violence or theft against that person in the other state or country, the person is punishable for that crime of violence or theft in this state in the same manner as if the crime had been committed within this state."

Section 778a, subdivision (a),[14] does not limit jurisdiction to crimes consummated in another state.  Based on the plain language of the statute, the crime may culminate anywhere outside California.  Webster's Third New International Dictionary defines "without" to mean, among other things, "outside of a particular place." (Webster's 3d New Internat. Dict. (2002) p. 2627, col. 2.)  Subdivision (a) includes no limitation as to whether "without" is federal land, a United States state or territory, a foreign country, or the high seas.  California case law supports the conclusion subdivision (a) does not limit jurisdiction to other states.  (See *People v. Renteria* (2008) 165 Cal.App.4th 1108, 1116 [crime culminated on Camp Pendleton, a federal enclave]; *People v. Brown* (2001) 91 Cal.App.4th 256, 266-267 (*Brown*) [crime culminated in Mexico]; *People v. Harden* (1936) 14 Cal.App.2d 489, 492 [crime culminated in Mexico].)  The Orange County Superior Court had jurisdiction over a murder committed

---

[14]  All references to subdivisions in section I.B.2.a are to section 778a.

33

off the coast of Italy so long as de minimis preparatory acts were committed in Orange County. (*People v. Morante* (1999) 20 Cal.4th 403, 436 (*Morante*) [preparatory acts more than de minimis acts toward completion of the offense].) Kocontes does not dispute there was sufficient evidence of de minimis Orange County preparatory acts.

Kocontes relies on subdivision (b) to support his claim subdivision (a) confers jurisdiction only to crimes culminated in another state. Subdivision (b), which the Legislature added in 1991 (Stats. 1991, c. 635, § 1, p. 2940), concerns kidnapping offenses and includes the language, "another state or *country*." (Italics added.) He asserts the inclusion of "country" in subdivision (b), and its omission in subdivision (a), evidences the Legislature's intent to limit jurisdiction in subdivision (a), to other states. We are not persuaded.

As our Supreme Court recognized, the "Legislature's addition of section 778a, subdivision (b), in 1991 did not affect" subdivision (a). (*Morante, supra,* 20 Cal.4th at pp. 429-430 [subdivision (a) concerns crime committed "outside the state"].) As we explain above, subdivision (a) places only one geographical limit on where a crime is committed—outside of California. Additionally, had the Legislature wanted to limit subdivision (a)'s reach, it could have added "in another state." That is the Legislature's role, not ours. (*J.M. v. Huntington Beach Union High School Dist.* (2017) 2 Cal.5th 648, 657, fn. 7 [it is for the Legislature, not the appellate courts, to rewrite statutes].)

Finally, Kocontes relies on a couple cases for the first time in his reply.[15] First, his reliance on *People v. Betts* (2005) 34 Cal.4th 1039, 1047 (*Betts*), to assert subdivision (a) is limited to "interstate situations" is misplaced. *Betts* did not concern a crime committed outside the United States. Additionally, the *Betts* court used the phrase

---

[15]      This is one of a couple instances where Kocontes relies on cases in reply that the Attorney General cites to in his respondent's brief. They are not recently decided cases.

when referring to a series of statutes regarding territorial jurisdiction and not just subdivision (a).  (*Ibid.*)  Finally, when discussing subdivision (a), the *Betts* court cited to *Morante, supra,* 20 Cal.4th 403, the case in which the court held subdivision (b) did not affect subdivision (a).  (*Betts, supra,* 34 Cal.4th at p. 1047.)

Second, *Small v. United States* (2005) 544 U.S. 385, is inapposite.  That case did not concern subdivision (a), or language similar enough to be persuasive.  (*Id.* at pp. 390-391 ["convicted in any court"].)

Although our inquiry can end because subdivision (a)'s statutory language is clear and unambiguous, we briefly address Kocontes's remaining claims.  Citing to the Legislature's 1905 enactment of section 778a, Kocontes claims its title and comments demonstrate jurisdiction was limited to crimes culminated in other states.  As to section 778a's title, Kocontes repeatedly states section 778a's current title reads as it did in 1905, "'Performance of an act in this state culminating in a crime in another state.'"  To the contrary, section 778a's title states, "Offenses commenced within but consummated without state."  Nevertheless, "[i]t is well established . . . that the publishers' titles are unofficial and not part of the act as adopted by the Legislature.  [Citation.]"  (*San Joaquin Helicopters v. Department of Forestry* (2003) 110 Cal.App.4th 1549, 1562 ["Title or chapter headings are unofficial and do not alter the explicit scope, meaning, or intent of a statute"].)  With respect to section 778a's Code Commission Notes, it is more appropriate to follow subdivision (a)'s clear and unambiguous language, especially when it does not lead to an absurd consequence.  (*Granite Construction Co. v. Superior Court* (1983) 149 Cal.App.3d 465, 468 [legislative history does not justify departing from clear legislative language unless leads to absurd consequences].)

Finally, Kocontes's due process and ex post facto claims are meritless because it was clear well before 2006 that subdivision (a)'s reach extended to anywhere outside California.  (*Brown, supra,* 91 Cal.App.4th at p. 267 [rejecting defendant's due process claim in 2001 pertaining to the jurisdictional reach of subdivision (a)].)  As

35

subdivision (a)'s language is clear and unambiguous, the rule of lenity is inapplicable. (*People v. Athar* (2005) 36 Cal.4th 396, 404 [rule of lenity applies when there are two reasonable interpretations].)

b. *Federal Constitution*

Citing to the federal constitution, Kocontes asserts only the United States government had federal jurisdiction over a crime culminated on the high seas and not one of the 50 states.[16] Again, we disagree.

Article I, section 8, clause 10 of the United States Constitution provides that "Congress shall have the power . . . to define and punish Piracies and Felonies committed on the high Seas, and offences against the Law of Nations." The Supremacy Clause of the United States Constitution provides the laws of the United States "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) Thus, "'[t]he States possess

---

[16] Kocontes's briefing is perplexing. In his opening brief, he devotes six and a half pages to this issue and cites to Article I, section 8, clause 10 of the United States Constitution three times, once in the introduction, once in a heading, and once in the argument section. Kocontes's cursory treatment requires one to guess how the constitutional provision prohibits California from exercising its jurisdiction.

In his 187-page reply brief, he devotes 30 pages to this issue and cites to the constitutional provision nine times. Needless to say, he offers a new gloss on his argument and cites to cases for the first time. This is prohibited. (*Nordstrom, supra,* 186 Cal.App.4th at p. 583.)

In the introduction to this brief, Kocontes states, "The effort to keep briefing short and concise should not be interpreted as a lack of confidence in the merits of the matters not expressly addressed." We would not characterize the reply brief as "short and concise." One is required to parse through much extraneous information in an attempt to ascertain which principles of federal law prohibit California from exercising its jurisdiction.

Kocontes was charged in a California court with committing a murder off the coast of Italy. One of the first, if not the first, issues that comes to mind is territorial jurisdiction. If not evident yet, it will soon become evident, Kocontes's shotgun approach to presenting appellate issues does a disservice to this court.

sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause.'" (*Burt v. Titlow* (2013) 571 U.S. 12, 19.)

States possess "'traditional police powers to define the criminal law and to protect the health, safety, and welfare of their citizens.'" (*Gonzales v. Raich* (2005) 545 U.S. 1, 29, fn. 38.) Indeed, "it has always been understood that the several states are independent sovereigns possessing inherent police power to criminally punish conduct inimical to the public welfare, even when that same conduct is also prohibited under federal law." (*In re Jose C.* (2009) 45 Cal.4th 534, 544 (*Jose C.*).) "The Constitution leaves in the possession of each State 'certain exclusive and very important portions of sovereign power.' [Citation.] Foremost among the prerogatives of sovereignty is the power to create and enforce a criminal code. [Citations.]" (*Heath v. Alabama* (1985) 474 U.S. 82, 93.)

In other words, because individual states and the United States are "'two sovereignties, deriving power from different sources, capable of dealing with the same subject-matter within the same territory,' each may punish the same act without offending double jeopardy principles. [Citation.]" (*Jose C., supra,* 45 Cal.4th at p. 545.) "Thus, Congress may pass a law barring a particular act and imposing a specific punishment, and a state legislature may pass a state law barring the same act and imposing a different specific punishment, as well as vesting jurisdiction over violations of the state law in its state courts, without encroaching upon the exclusive jurisdiction of the federal courts to adjudicate violations of the federal law and impose the federal punishment." (*Ibid.*)

Preemption analysis starts "'with the assumption that the historic police powers of the States [were] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citation.]" (*Altria Group, Inc. v. Good* (2008) 555 U.S. 70, 76-77.) Only where the state and federal laws cannot be reconciled do

courts hold that Congress's enactments must prevail.  (*Ibid.*)  Our standard of review is de novo.  (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10.)

Based on title 18 United States Code section 1111, "Murder," and title 18 United States Code section 7, "Special maritime and territorial jurisdiction of the United States defined," Congress has affirmatively expressed its intent to permit the United States to prosecute murders committed on foreign vessels, on the high seas, and anywhere outside the jurisdiction of any nation, if the perpetrator or the victim is a United States national.  In section 187, "'Murder' defined," and section 778a, subdivision (a), "Offenses commenced within but consummated without state," the Legislature affirmatively expressed its intent to permit California to prosecute murders committed outside California if there were de minimis preparatory acts in California.  Pursuant to this authority, the United States and California had concurrent jurisdiction over a crime committed on the high seas.  Kocontes cites to no authority, and we found none, that provides for exclusive federal jurisdiction.  And California did not usurp federal jurisdiction when the Legislature enacted sections 187 and section 778a, subdivision (a).  Thus, Kocontes has not carried his """"considerable burden of overcoming 'the starting presumption that Congress does not intend to supplant state law.'""  [Citations.]" (*Solus Industrial Innovations, LLC v. Superior Court* (2018) 4 Cal.5th 316, 332.)

Indeed, as the United States Supreme Court opined, "If the United States may control the conduct of its citizens upon the high seas, we see no reason why [a State] may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." (*Skiriotes v. Florida* (1941) 313 U.S. 69, 77 (*Skiriotes*); *People v. Weeren* (1980) 26 Cal.3d 654, 659 [California may exercise penal control over its citizens extraterritorially to protect its legitimate interests].)  Florida Supreme Court cases are in accord.  (*State v. Stepansky* (Fla. 2000) 761 So.2d 1027, 1034; *Keen v. State* (Fla.

1987) 504 So.2d 396, 399, disapproved on other grounds in *Owen v. State* (Fla. 1992) 596 So.2d 985.)  Kocontes's attempt to distinguish these cases is unavailing.

The United States Constitution's grant of power to Congress to "define and punish Piracies and Felonies committed on high Seas" (U.S. Const, art. I, § 8, cl. 10), does not preclude states from punishing an act that also violates the state's laws.  The same act or omission can offend the laws of both the state and federal government. (*Abbate v. United States* (1959) 359 U.S. 187, 194 ["'[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each'"].)

Kocontes and Kanesaki were California residents, and Kocontes does not dispute there was sufficient evidence of de minimis preparatory acts in California that culminated in Kanesaki's death off Italy's coast.  Contrary to Kocontes's claim, murder, committed by a California resident against a California victim, is not uniquely a federal concern, even when committed on the high seas.

Kocontes's reliance on *Sturges v. Crowninshield* (1819) 17 U.S. 122, 193, a case concerning bankruptcy, an unquestionably federal concern, is misplaced. Additionally, this case does not concern piracy, admiralty law, treaties, or foreign affairs and his citation to cases concerning those issues is inapposite.

Citing to several treaties, Kocontes claims states are forbidden from exercising their jurisdiction in international waters on a non-United States flag ship.  An individual has no standing to invoke treaties.  (*Skiriotes, supra,* 313 U.S. at pp. 74, 76 [defendant no standing to invoke treaties].)  As our Supreme Court stated, "As federal and state court decisions repeatedly have held, an individual lacks standing to challenge an asserted violation of an international treaty if the sovereign who is a party to the treaty does not protest." (*People v. Salcido* (2008) 44 Cal.4th 93, 125.)  Hearing no protest, we reject this claim.

*II. Trial*

*A. Massiah*

Kocontes argues admission of evidence he solicited bribery or murder of Nguyen violated his Sixth Amendment rights pursuant to *Massiah, supra,* 377 U.S. 201. He asserts the trial court erred by admitting all the evidence obtained after King became a government agent on April 22, 2014, including the jail cell recordings, recordings of telephone calls with Beeman and Kasim, documentary evidence from his jail cell, and Dropbox audio recordings. A complete discussion of *Massiah* and its progeny and a comprehensive review of our record, neither of which Kocontes provides, refutes his claim.

Preliminarily, we note neither party recites the testimony or argument from the multiday evidentiary hearing on the *Massiah* issue. On pages 80 and 81 of his opening brief, Kocontes provides a chronology of facts and cites to two motions from June 2017. But the facts he cites to are from *trial* testimony. The motions he cites to were filed after the trial court ruled it would conduct an evidentiary hearing on the issue and do not mention *Massiah*. Kocontes's opening brief is 234 pages *long*, yet it omits relevant background information. The Attorney General's recitation of the factual background on pages 117 to 119 fares no better, referencing "the myriad motions" and "lengthy hearing with extensive testimony and argument." Although it is not the Attorney General's burden, a complete recitation of the hearing would have been helpful.

The trial court conducted a four-day evidentiary hearing from July 31 to August 3, 2014, where Voght and Beeman testified; Kocontes did not call King to testify although he had been transported to the courthouse and his counsel was in the courtroom during the hearing. We provide a complete recitation of these facts to assist in our review.

*1. Background*

In November 2013, the matter was assigned to Judge Stotler for all purposes.

In his March 2015 motion to dismiss, Kocontes stated he was in custody at the Orange County jail beginning in February 2013. He said that from June 2014 to October 2014 the OCDA violated his Sixth Amendment right to counsel when the OCDA housed a government informant in his cell and caused a law enforcement officer to communicate with him.

The OCDA asserted that in early 2014, Kocontes approached two inmates to kill Nguyen, who was a material witness in this case. One of the inmates, King, informed the OCDA, and they met. The OCDA entered into an agreement with King that he would act as an informant. However, the OCDA instructed King to not discuss the pending murder charge. The OCDA arranged for Beeman ("Greg") to act as King's friend, and they both communicated with Kocontes. The OCDA repeatedly stated there was no need for an evidentiary hearing because it did not intend to use this evidence in this case. The other inmate, Semanu, later confirmed Kocontes solicited him to kill Nguyen before Kocontes solicited King.

In his reply, Kocontes described the prosecution's solicitation to murder theory as absurd. Kocontes stated Nguyen was his star witness and a complete review of her statements would vindicate him, i.e., she did not implicate him in Kanesaki's murder until the OCDA contacted her. Kocontes asserted there was no evidence he said anything to Beeman about murdering Nguyen. He noted that although the OCDA said it would not use the evidence in its case, it did not address whether it would use the evidence to impeach him if he testified or during rebuttal.

In a supplemental reply brief, Kocontes stated King arranged for him to speak with Beeman, who posed as a private investigator. Kocontes said he provided Beeman critical material and strategy in this case and that had nothing to do with the

41

solicitation case. He added that even if the questioning concerned the solicitation case, the solicitation case was "so closely connected with the" murder case it implicated his right to counsel.

At a hearing on the motion, the prosecution requested the opportunity to file a response to Kocontes's supplemental brief. Judge Stotler granted the request. The following month, Judge Stotler vacated all further briefing pending this court's stay in *Kocontes, supra,* G051809.

In March 2016, the matter was reassigned to Judge King because Judge Stotler retired. On March 13, 2017, there was a hearing on this and other motions. The trial court stated it had read the written motions. Over the prosecution's objection, the court ruled it would conduct an evidentiary hearing.

The trial court conducted an evidentiary hearing that spanned four days, from July 31 to August 3, 2017. Before witnesses testified, the court required Kocontes's counsel to specify what evidence the prosecution obtained in violation of *Massiah, supra,* 377 U.S. 201. Counsel stated there were four items the prosecution obtained via its informant. First, Brentnell was one of two people who would testify Kocontes admitted killing Kanesaki. Kocontes's investigator, McQueen, would testify Brentnell threatened to go the FBI unless Kocontes forgave a $50,000 loan to him. Second, Price, Kocontes's friend and a private investigator, admitted he received $150,000 and was owed $6,000 for services rendered despite denying he worked for Kocontes concerning Kanesaki's murder. Third, Nguyen, who was the other person who would testify Kocontes admitted killing Kanesaki, previously said Kocontes threatened to kill her and recanted. Fourth, Kocontes's declaration impeaching Nguyen and Price.

Voght testified the OCDA's office contacted him and said King had information about Kanesaki's murder. On April 22, 2014, the OCSD and the OCDA met with King and his attorney. King said Kocontes told him that Nguyen had to "disappear." There was a second meeting on June 6. Voght participated in the decision

42

to move King into Kocontes's jail cell.  After his recollection was refreshed, Voght stated the OCDA and King executed a written agreement whereby King would cooperate.  In exchange, if there were any arrests, King would be released from jail immediately.  King was released from jail in late 2014.

The OCSD moved Kocontes into King's cell on June 10, 2014, and he remained there until July 9, 2014.  A recording device was placed in the cell about the same time.  Voght testified King gave him "volumes" of documents that he copied and returned to King.  He agreed that in the recordings he listened to Kocontes never admitted he killed Kanesaki.

Voght testified concerning audio and written files they obtained from Dropbox.  Voght helped Beeman obtain two recordings from Dropbox.  Voght wrote a search warrant that Judge Prickett granted to listen to the recordings.  He provided all the information to the OCDA's office.

On cross-examination, Voght confirmed Assistant District Attorney Susan Price was not at any of the meetings with King.  The following colloquy occurred:

"[Prosecutor]:  Based on listening to the audios of the jail recordings, were you able to corroborate that there were conversations that were in whispered or hushed tones with the toilet flushing?

"[Voght]:  Yes, several times.

"[Prosecutor]:  In all of the recordings that you've reviewed, did you ever hear . . . King ask [Kocontes] about the circumstances of his murder case?

"[Voght]:  Yes.

"[Prosecutor]:  Tell me about that.

"[Voght]:  Well, I'm sorry.  Did I hear it over the recordings, or did the— did . . . King tell me what was related to him?

"[Prosecutor]:  Let's listen to the question very carefully.

"[Voght]:  Sure.

43

"[Prosecutor]: Let me back up a moment. Were admonishments given to . . . King regarding this investigation.

"[Voght]: Yes.

"[Prosecutor]: Okay. What was the -- what were the admonishments given?

"[Voght]: The admonishments were not to solicit any information from . . . Kocontes regarding the murder case of . . . Kanesaki." Voght acknowledged the agreement between the OCDA and King also included the admonishment.

Voght explained that when they met King on April 22, 2014, he told them that Kocontes implicated himself in Kanesaki's murder, and he solicited him and Semanu to kill Nguyen. Voght said that to his knowledge Beeman never told Kocontes he was an investigator.

On redirect examination, Voght clarified King reported the following: Kocontes told King that he hired Price to pay someone to kill Kanesaki. He agreed that during one recording he heard Kocontes claim his innocence regarding Kanesaki's murder and he relayed that to King in late 2014. Voght stated he gave Beeman's cell phone number to King to give to Kocontes. Voght repeated King gave him documents he said he got from Kocontes. Voght copied and returned some of the documents. He kept other documents and booked them into evidence.

On recross-examination, Voght stated King said Kocontes admitted he paid Price to hire people to kill Kanesaki. Kocontes offered to pay King $100,000 to have Nguyen killed. Voght said King reported Kocontes threatened other potential witnesses. Voght said that at every interview they admonished King to not ask Kocontes about Kanesaki's murder. Although he previously answered in the affirmative when asked, Voght added he never heard King ask Kocontes about Kanesaki's murder on the recordings he listened to.

44

Beeman testified Voght asked him to attend the June 6 meeting with King. At the meeting, King said Kocontes asked him to help have Nguyen change her testimony or solicit her murder. King said he told Kocontes he had a friend who could do the job. Beeman said a decision was made to move Kocontes into King's cell. King told them the friend was "fictitious," he made it up. At a meeting a few days later, King told them that he told Kocontes that his friend's name was "Greg." Beeman knew Kocontes moved into King's cell on June 10, 2014. From June 13 to July 9, Beeman spoke to King on Beeman's undercover phone number. After King moved out of the cell on July 9, Beeman spoke to Kocontes by calling the same number. They spoke seven times. He never mentioned "wanting to have . . . Nguyen killed." He did, however, infer he wanted Beeman's help in convincing her to write a declaration saying her grand jury testimony was false. He also used coded language to indicate he wanted Beeman to harm Nguyen.

Beeman testified about how Kocontes wanted him to meet Kasim. He explained how he typed a "coded" letter introducing himself to Kocontes that he gave to Kasim to send to Kocontes described as "legal mail." The court recessed for the day.

The following day, Beeman resumed testifying. When Kocontes's trial counsel questioned Beeman about conversations he had with Kocontes on July 19, 2014, and August 9, 2014, Beeman interpreted the coded language to mean Kocontes wanted Nguyen murdered. On August 24, 2014, Beeman sent Kocontes a letter using coded language. They spoke again on September 15, 2014.

Beeman testified King gave Voght Kocontes's documents and Voght gave them to him. Beeman stated Kasim e-mailed Dropbox audio files to him, and he spoke with Kocontes about the information on those files, but he did not listen to them. He gave them to Voght.

On cross-examination, Beeman testified he met with Kasim and she asked him if he was going to "'take [Nguyen] out.'" The prosecutor asked Beeman a series of questions concerning the murder case. Beeman stated he never asked Kocontes about

45

Kanesaki's murder or asked him about the strategies he intended to use during his murder trial.

On redirect examination, Beeman stated the majority of his conversations with Kocontes concerned Nguyen changing her testimony. Beeman said there was nothing in the information he reviewed indicating Kocontes wanted to harm Nguyen.

After the trial court recited what it believed were the undisputed facts and the legal issues, counsel argued. The court granted Kocontes's request to submit supplemental briefing, which he did.

The trial court issued a written ruling. The court ordered that because the prosecution represented it would not use Kocontes's statements while represented by counsel or documents obtained from King, the parties were ordered not to mention them. The court added that if either party intended to offer this evidence, the party had to notify opposing counsel, and upon request, the court would conduct an Evidence Code section 402 hearing. Citing to *People v. Guillen* (2014) 227 Cal.App.4th 934 (*Guillen*), the court opined there was no outrageous government conduct because law enforcement was justified in initiating and conducting the investigation of the solicitation of murder. The court denied Kocontes's request to exclude Price's, Nguyen's, and Brentnell's testimony. The court concluded Kocontes had not lost the ability to impeach these witnesses.

The following month, David Michael and James Bustamante filed a motion to be relieved as Kocontes's counsel of record. A few months later, the court appointed the Associate Defender (Gragg) to represent Kocontes.

The matter proceeded to trial in 2020. After the prosecution had presented its case-in-chief and Kocontes had offered several witnesses' testimony, Gragg moved to preclude the prosecution from cross-examining Kocontes on four areas, including the jail conduct and the solicitation case, before Kocontes took the stand to testify. After counsel argued, the court ruled the prosecution could inquire of Kocontes's conduct in jail and that would be the subject of an Evidence Code section 402, subdivision (b), hearing.

46

Gragg argued the prosecution should not be able to cross-examine him on these matters but only offer evidence on rebuttal. The prosecution said it intended all along to cross-examine Kocontes on the solicitation. Gragg asserted the trial court did not address the *Massiah* issue in the prior litigation and the court would have to conduct a *Massiah* hearing. The court commented, "[T]here wasn't a *Massiah* violation." Gragg repeated she read the court's order and "the [c]ourt expressly left the *Massiah* issue open."

After a couple witnesses testified and out of the jury's presence, the trial court indicated it reviewed the record and referred counsel to its August 9, 2017, order concerning whether it ruled on the *Massiah* issue. The court recessed for lunch.

That afternoon, Gragg asserted the trial court did not rule on the *Massiah* issue in its order. The court said "that within my ruling, I necessarily had to consider an alleged *Massiah* violation." Gragg said the *Massiah* issue is slightly different than the outrageous government conduct issue and "the [c]ourt never formally ruled on *Massiah*." The court indicated it would review the hearing transcripts and address the issue the following day.

The next day, March 12, 2020, Gragg said *Massiah* "was touched on, although it wasn't expressly the subject of those hearings." The court said it made factual findings at the hearing and issued a written order. After counsel argued, the court made the same factual findings it previously did. The court opined the law enforcement investigation was justified and Kocontes's statements were voluntary. The court ruled Kocontes's Sixth Amendment rights were not violated and it would allow the prosecution to use the statements for impeachment assuming the evidence was relevant.

On May 26, 2020, after the pause in proceedings because of the COVID-19 pandemic, the trial court restated its ruling on whether the prosecution could cross-examine Kocontes on the solicitation evidence.[17]

As we describe above, at trial, Kocontes testified, and the prosecutor cross-examined him regarding the solicitation evidence. Pursuant to Gragg's agreement, the prosecutor presented three rebuttal witnesses out-of-order—King, Beeman, and Voght.

2. *Law and Analysis*

"The Sixth Amendment to the United States Constitution guarantees the assistance of counsel during all stages of a criminal prosecution. In *Massiah*[*, supra,*] 377 U.S. 201 . . . , the high court held that once a defendant has been charged with any crime, any 'government agent[]' who elicits incriminating statements from a defendant regarding that crime outside the presence of counsel violates this protection. [Citation.] Statements made under such conditions 'are inadmissible at a trial on the charges to which the statements pertain.' [Citations.] This prohibition on government agents applies equally to law enforcement officers and private persons enlisted by the government to elicit incriminating statements. '[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation.' [Citation.]" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1152 (*Johnsen*).)

"'A trial court's ruling on a motion to suppress informant testimony is essentially a factual determination, entitled to deferential review on appeal.' [Citation.]

---

[17]    Kocontes asserts that in its August 9, 2017, order, the trial court "implicitly concluded" there was a *Massiah* violation and at trial, the court "backtracked" and concluded there was no *Massiah* violation. That is not how we read the record. Although the court's order could have been clearer and expressly mentioned *Massiah*, there was no need. The prosecution indicated it did not intend to offer the solicitation evidence in its case-in-chief, which is what *Massiah* expressly forbids. When Gragg inquired about the court's ruling at trial in March 2020, and noted the court's order did not mention *Massiah*, the court opined there was no *Massiah* violation. Based on our review of the record, the trial court did not "backtrack" on its ruling.

To prevail, [the defendant] must show '"that the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements."' [Citations.] 'Circumstances probative of an agency relationship include the government's having directed the informant to focus upon a specific person, such as a cellmate, or having instructed the informant as to the specific type of information sought by the government.' [Citation.]" (*Johnsen, supra,* 10 Cal.5th at p. 1152.)

"[T]he defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 459, superseded by statute as stated in *Banister v. Davis* (2020) __ U.S. __ [140 S.Ct. 1698, 1709, fn. 8].) "[A]ctual interrogation by an informant is not required in order to satisfy this element. [Citation.] Thus, where a fellow inmate, acting pursuant to a prearrangement with the government, 'stimulate[s]' conversation with a defendant relating to the charged offense [citation], or actively engages the defendant in such conversation [citation], the defendant's right to the assistance of counsel, as defined by *Massiah*, is violated." (*In re Neely* (1993) 6 Cal.4th 901, 915-916.) There is no *Massiah* violation "where an informant-cellmate is simply a 'listening post' and does not ask questions or solicit information. [Citations.]" (*In re Wilson* (1992) 3 Cal.4th 945, 950 (*Wilson*).) "[O]nce formal criminal proceedings begin, the Sixth Amendment renders inadmissible in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel. [Citations.]" (*Michigan v. Harvey* (1990) 494 U.S. 344, 348.)

"[A]ttachment of the right to counsel with regard to one charge does not immunize a defendant from investigation of other criminal conduct, and '[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet

49

attached, are . . . admissible at a trial of those offenses.' [Citations.] Incriminating statements obtained in circumvention of a defendant's right to counsel with respect to a charged offense, however, are inadmissible at the trial *of that charged offense* even if they pertain to a new and uncharged crime. [Citations.]" (*Wilson, supra,* 3 Cal.4th at pp. 950-951, quoting *Maine v. Moulton* (1985) 474 U.S. 159, 178-180 & fn. 6 (*Moulton*).)

Here, there was no dispute Beeman, acting as Greg, and King were both government agents. Beeman was an OCSD investigator. King, after he met with authorities on April 22, 2014, was acting pursuant to an agreement with the OCDA. Thus, *Massiah's* first prong was met. However, the record is devoid of any evidence government agents deliberately elicited incriminating statements about the charged offense. The Attorney General, in its respondent's brief, asserts as much. But in his reply brief, Kocontes does not address this issue.

The record before us includes no evidence either King or Beeman deliberately elicited incriminating statements from Kocontes about Kanesaki's death. There was no testimony from King that he questioned Kocontes about the charged offense. Indeed, Kocontes's counsel did not call King to testify at the evidentiary hearing in the summer of 2017. Additionally, during the April 22, 2014, interview, an OCDA investigator twice told King not to discuss the murder case. Voght confirmed they admonished King to not ask about the charged offense, and he never heard King ask Kocontes about the charged offense during the recordings he listened to.[18] Beeman testified he did not question Kocontes about the charged offense or strategies he intended to use during his murder trial.

Voght's and Beeman's testimony established they were investigating a new crime—Kocontes's soliciting King and Beeman to bribe or murder Nguyen. *Moulton*

---

[18]       The record before us includes no audio recordings; Kocontes did not transmit audio recording exhibits to this court for our review.

holds attachment of Kocontes's right to counsel for the murder of Kanesaki did not immunize him from investigation for soliciting crime(s) concerning Nguyen. (*Moulton, supra,* 474 U.S. at p. 180, fn. 16.) That the facts regarding Kanesaki's murder and soliciting crime(s) against Nguyen were inextricably intertwined or closely related does not alter our conclusion. (*Texas v. Cobb* (2001) 532 U.S. 162, 168 (*Cobb*) [Sixth Amendment right to counsel attaches only to charged offense and there is no exception for uncharged crimes that are "'factually related'" to charged offense]; *People v. Slayton* (2001) 26 Cal.4th 1076, 1082-1085 [discussing *Cobb* and concluding some offenses identical and some not].) Voght and Beeman were investigating Kocontes soliciting criminal conduct that had not been charged and the right to counsel had not attached.

Kocontes contends the trial court should have excluded all the solicitation evidence. But he does not cite to any place in the record where King or Beeman deliberately elicited incriminating statements from him about Kanesaki's death. The record includes transcripts of 10 recordings between Kocontes and King and five recordings between Kocontes and Beeman. Kocontes cites to nowhere in these transcripts where King or Beeman questioned him about Kanesaki's murder. At oral argument we asked Kocontes's appellate counsel what evidence there was, if any, that King or Beeman deliberately elicited statements from Kocontes about the charged offense. She could cite to none. Based on the record before us, we conclude King and Beeman were nothing more than listening posts.[19]

An additional basis for admission of the solicitation evidence was for impeachment purposes. In *Kansas v. Ventris* (2009) 556 U.S. 586, 593-594, the United States Supreme Court held statements obtained in violation of *Massiah* are admissible for

---

[19] Kocontes claims the solicitation evidence was improper propensity evidence, and the trial court should have given the jury a limiting instruction. He cites to no place in the record where he requested one, and thus this claim is forfeited. (*People v. Sánchez* (2016) 63 Cal.4th 411, 460 [trial court no sua sponte duty to instruct concerning limited admissibility of past criminal conduct evidence].)

51

impeachment purposes if the defendant testifies at trial. Here, on direct examination, Kocontes testified he never threatened Nguyen. Evidence obtained during the solicitation investigation that Kocontes solicited others to harm Nguyen was inconsistent with his trial testimony and thus admissible to impeach Kocontes.

Kocontes relies on *Moulton, supra,* 474 U.S. 159, and *Wilson, supra,* 3 Cal.4th 945, to support his claim the trial court erred by admitting the solicitation evidence. His reliance on those cases is misplaced. In both cases, the government agent deliberately elicited incriminating statements. (*Moulton, supra,* 474 U.S. at pp. 176-177 & fn. 14; *People v. Wilson* (1992) 3 Cal.4th 926, 933-934 & fn. 2; *Wilson, supra,* 3 Cal.4th at pp. 948, 954.) Additionally, in neither case was the evidence admitted for impeachment purposes. Because we conclude there was no error, we need not address prejudice. Therefore, the trial court did not err by denying Kocontes's motion to dismiss because his Sixth Amendment rights were not violated.

## B. Outrageous Government Conduct

Kocontes argues Price was a member of the defense team and the prosecution solicited him to divulge privileged information, which was outrageous governmental conduct and violated his Fifth and Sixth Amendment rights. He seeks outright dismissal of the charges, or exclusion of Price's, McQueen's, Brentnell's, and Nguyen's testimony, including Price and McQueen's recorded interview of Nguyen in 2009. As we explain below, Kocontes failed his burden to demonstrate error.

## 1. Background

On December 12, 2013, Kocontes filed a motion to dismiss the indictment pursuant to section 995 based on numerous grounds. As relevant here, Kocontes contended Price was a defense investigator and his testimony was protected by the attorney-client privilege. Kocontes filed voluminous exhibits in support of the motion, including Price's 2013 Orange County grand jury testimony, Simpson's December 11, 2008, FBI report, Price's affidavit, and Werksman's declaration. In its opposition, the

52

prosecution asserted there was no evidence Price was Kocontes's investigator. In his reply, Kocontes stated there was evidence either he or his attorney paid Price for his investigative services.[20]

In his August 4, 2014, written order, Judge Stotler denied Kocontes's motion to dismiss. Citing to Price's Orange County grand jury testimony he never performed any investigative work on Kocontes's murder case investigation, Judge Stotler ruled as follows: "[T]here [was] no attorney-client privilege violation nor [was] there a viable theory of the prosecution invading or interfering with the defense case."

Despite Judge Stotler's ruling, Kocontes filed numerous motions that addressed this issue with Judge King. On June 21, 2017, Kocontes filed a motion to dismiss for "invasion of defense and violation of attorney[-]client privilege" or to exclude Price's testimony. Kocontes asserted Price was his lead investigator on Kanesaki's death, and the prosecution contacted him and obtained privileged information. Kocontes supported the motion with various exhibits, including Werksman's declaration and Simpson's report. The same day, Kocontes filed a motion to dismiss for outrageous government conduct arguing the prosecution deliberately and fraudulently induced Nguyen to implicate him in Kanesaki's murder. In its opposition, the prosecution asserted Judge Stotler previously ruled on this issue and the allegedly impermissibly obtained evidence did not involve privileged communications.

As we explain above, the trial court conducted a multiday evidentiary hearing in the summer of 2017. At the outset, pursuant to the court's request, Kocontes's counsel stated one of the items the prosecution obtained was a recording of a 2011

---

[20] Kocontes filed numerous pretrial motions raising and reraising issues concerning Nguyen and Price. The complexity of the motion work was exacerbated by the fact Gragg used similar titles for some of the motions. For example, the March 18, 2015, motion to dismiss is titled in part "improper infiltration of the defense camp." This was the *Massiah* motion discussed above and did not involve Price. His June 21, 2017, motion to dismiss is titled in part "invasion of defense." This motion concerned whether Price was Kocontes's investigator and the OCDA obtained privileged information.

conversation between Kocontes and Price that was "attorney work product." Counsel stated that during this conversation, Price demanded more money to work as his investigator and confirmed he had received $150,000 for investigative work during the preceding 12 months. Counsel explained "the critical issue, whether . . . Price was" Kocontes's investigator and the issue was "the subject of a couple motions." He added Price repeatedly denied he was Kocontes's investigator and this evidence impeached him.

The prosecution described the relationships between the parties as "sordid" and stated the conversation between Kocontes and Price "lack[ed] . . . clarity." The prosecutor said Price "[was] adamant even to this day that he did not represent [Kocontes] in an investigative capacity in the murder case" and the issue "[was] surely going to be a subject of disagreement at the time of trial." Voght and Beeman testified at the evidentiary hearing as described above.

As relevant to this motion, Kocontes's counsel argued the evidence established Price was Kocontes's investigator. The prosecutor responded Price repeatedly denied that.

In its August 9, 2017, order, the trial court concluded law enforcement was justified in investigating the alleged solicitation and Kocontes's due process rights were not violated. The court denied his request to exclude Price's, Nguyen's, and Brentnell's testimony because there was no outrageous government conduct and Kocontes had not lost the ability to impeach their testimony. Two days later, Kocontes filed a motion for reconsideration of the court's denial of the motion to dismiss based on invasion of the defense camp.

The following month, the trial court addressed the reconsideration motion. After a lengthy discussion, the court again denied the motion for outrageous government conduct. The court then addressed the motion to dismiss or exclude evidence because Price was Kocontes's investigator. The prosecutor asserted Judge Stotler already decided the issue and cited to its opposition.

54

Counsel argued the documentary evidence established Price was Kocontes's investigator but that he denied it beginning in 2008. Counsel asserted that in 2009, Price met with Nguyen "and disclosed to her privileged information" concerning the investigation and obtained her statements that he then gave to law enforcement. When the trial court asked counsel what he was asking to exclude, counsel responded Nguyen's statement to Price in 2009 and her grand jury testimony in 2013. Counsel stated that the time of the statement, Kocontes's attorney was Werksman, and Price was working for him. The court inquired whether the privilege applied if a third party, Nguyen, divulged the information. When counsel asserted Price "coerce[d] and cajole[d] . . . Nguyen into making false statements," the court stated it had decided that issue and the issue now was one of privilege. The prosecutor did not concede but assumed for purposes of argument only that Price was Kocontes's investigator, Nguyen's disclosure as a third party was not protected by the privilege.

The trial court denied Kocontes's "motion to dismiss for invasion of the defense and violation of the attorney-client privilege and, in the alternative, motion to exclude." The court stated, "Based on the hearing that I've had before me, I cannot conclude that the statements that were given to . . . Nguyen were privileged, either under the attorney-client privilege or the work product privilege."

2. *Law and Analysis*

Once again, Kocontes recitation of the background facts is deficient and confusing to say the least. In the introduction to this argument, he challenges the trial court's denial of his June 21, 2017, motion to dismiss for outrageous government conduct and invasion of the defense camp. Judge King presided at the time of this motion. However, in his recitation of facts on pages 107 to 118 of his opening brief, nearly all of Kocontes's citations to the record are to the exhibits in support of his motion to dismiss while Judge Stotler presided and trial testimony. Kocontes submitted some of the exhibits to Judge King, but he provides only one citation to an exhibit submitted with the

55

motion to Judge King. (*Duarte v. Chino Community Hospital* (1999) 72 Cal.App.4th 849, 856 [factual contentions must be supported by correct, page-specific citations to the record]; Cal. Rules of Court, rule 8.204(a)(1)(C).)

Kocontes should have provided the relevant procedural and factual background to properly review that ruling. He states that "[a]fter several days of hearings, the court denied [his] motion." This was the 2017 evidentiary hearing described above. But again Kocontes does not recite what happened at the hearing. And although he asserts the prosecution committed outrageous government conduct, nowhere does he provide or discuss the applicable outrageous government conduct law. (See *Guillen, supra,* 227 Cal.App.4th at pp. 1002-1007.) He limits his discussion to whether Price divulged attorney-client privileged information. We limit our discussion accordingly.

"'The attorney-client privilege is "a privilege to refuse to disclose, and to prevent another from disclosing, a confidential communication between client and lawyer." [Citation.] That privilege encompasses confidential communications between a client *and experts retained by the defense*.'" (*People v. Roldan* (2005) 35 Cal.4th 646, 724, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 (*Doolin*); Evid. Code, § 952 [defining "'confidential communication between client and lawyer'" as including information disclosed to "third persons . . . who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted"].)

"'On appeal, the scope of judicial review is limited. "When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such

finding if there is any substantial evidence to support it [citations]." [Citation.]'
[Citation.]"[21] (*People v. Gutierrez* (2009) 45 Cal.4th 789, 818 (*Gutierrez*).).

Below, and on appeal, the parties agree the issue of whether Price was a member of the defense team was fiercely contested. In his declaration, Werksman stated that in November 2008, Kocontes hired him to represent him in the federal murder investigation. Werksman said Kocontes represented to him that his previous attorney, Keller, retained McQueen and Price. Werksman added that based on conversation with Kocontes and Price and a meeting with Price and McQueen, he believed Price was Kocontes's investigator until he no longer represented him in July 2009.

In his report, Simpson stated he spoke to Price in December 2008. Price reported he had recently met with Werksman, who considered Price part of the defense team. Werksman intended to assert Kocontes's conversations with Price were privileged. Price told Werksman neither Kocontes nor his attorneys hired him as an investigator. During Orange County grand jury proceedings in 2013, Price testified he refused Kocontes's offer to investigate the murder and never worked for him on the murder investigation.

Substantial evidence supports Judge King's implicit conclusion Price was not Kocontes's investigator concerning Kanesaki's murder. As early as December 2008, when he spoke to Simpson, Price denied he was Kocontes's investigator on this case. Importantly, this was before he and McQueen met with Nguyen in 2009 where Nguyen implicated Price in Kanesaki's murder. Price's grand jury testimony five years later was consistent with his statement to Simpson. Additionally, Price testified Kocontes did not

---

[21] In his reply brief, Kocontes acknowledges the evidence determines this issue. He adds, "Thus, it is necessary to quote the evidence in more detail than was done in the opening brief." This requires a couple of comments. First, it is the opening brief where a party recites all the relevant evidence to decide an issue. In a reply brief, the appellant "replies" to the respondent's arguments. The general rule is we do not address new arguments presented in a reply. (*Nordstrom, supra,* 186 Cal.App.4th at p. 583.) Second, in his opening brief, he presented about 12 pages of evidence on this issue.

formally retain him so he could be his expert witness. Kocontes confirmed Price's non-investigator status, although explained it was so Price could "use [his] inside contacts to get inside information." Kocontes insisted Price was his investigator but two trial judges concluded otherwise. The trial court is in the best position to make credibility determinations and we will not disturb factual findings supported by substantial evidence. (*Gutierrez, supra,* 45 Cal.4th at pp. 817-818.) Kocontes disagrees strenuously with this conclusion, but we cannot disturb it on appeal.

Kocontes asserts all of his and his attorney's statements to Price, and McQueen, and all the information Price, and McQueen, developed for him and his attorney was privileged. But he does not specify what privileged statements Price divulged. He makes a broad claim without detailing what statements he obtained vis-à-vis Kocontes and Werksman that he later divulged to federal or county law enforcement. Additionally, the record includes evidence Price was speaking with the federal and state investigative teams at Kocontes's direction. One could reasonably infer from this evidence Kocontes orchestrated Price's cooperation with authorities to later assert the prosecution committed outrageous government conduct or for some other reason beneficial to Kocontes.

This is borne out by Kocontes's admission when discussing his claim the prosecution committed outrageous governmental conduct. He states the following: "The full extent of the information and benefit the government obtained from its illegal conduct is unknown. Short of a deposition of Stokes, Simpson, the AUSAs working on the case, the DAIs and detectives, Price, McQueen, and DDAs Price and Hunt—coupled with an examination of their calendars and phone records—the extent of the information received and how it shaped the prosecution investigative and trial strategy cannot be known." We agree it is unknown, what, if any, privileged information Price disclosed. To conclude otherwise would be pure speculation. Even assuming Price was Kocontes's

58

investigator, Kocontes has not carried his burden to establish Price divulged privileged communications.

As to Kocontes's claim Price developed privileged information for him and his attorney that he divulged to law enforcement, this claim too is meritless. Kocontes first cites to the 2006 polygraph with Brentnell. Based on our review of the record, it does not appear Kocontes asserted this was privileged information in the trial court. Thus, this claim is forfeited. (*People v. Partida* (2005) 37 Cal.4th 428, 435.) Nevertheless, the record does not support the conclusion this information was developed pursuant to the attorney-client privilege. An FBI report from November 2008 stated Price recommended Kocontes take a polygraph in the summer of 2006. Werksman did not represent Kocontes until 2008, and Kocontes cites to no evidence he agreed to the polygraph on the advice of counsel. And Kocontes cites to no evidence Keller or Rackauckas, who Kocontes asserts he hired in 2006, hired Price. That Price joined Keller and Rackauckas on the August 2006 Italy cruise does not by itself demonstrate they, or Kocontes, hired Price.

Kocontes also cites to Price and McQueen's 2009 recorded interview with Nguyen. In that interview, Nguyen told them that Kocontes told her that Price knew people who could throw Kanesaki overboard. Kocontes cites to no authority demonstrating Nguyen's statement to Price could be privileged. Kocontes made the statement before the cruise, and there is no assertion Nguyen was an attorney or a member of the defense team. (*Uber Technologies, Inc. v. Google LLC* (2018) 27 Cal.App.5th 953, 966 [attorney-client communication between lawyer and client concerning information transmitted between them in course of relationship and in confidence].) Kocontes had no reasonable expectation of privacy in what he told Nguyen.

Relying on *Morrow v. Superior Court* (1994) 30 Cal.App.4th 1252, Kocontes asserts the prosecution committed outrageous governmental conduct requiring

59

dismissal without a showing of prejudice. His reliance on *Morrow* is misplaced. In that case, the prosecution eavesdropped on an attorney-client communication in the courtroom and acquired confidential information. (*Id.* at p. 1261.) Unlike *Morrow*, Kocontes has not established the prosecution obtained privileged information.

Finally, Kocontes asserts, again without specifying what information, the prosecution violated his Fifth Amendment right to present a defense and due process and Sixth Amendment right to counsel by obtaining privileged information from Price. As we explain above, Kocontes has not established the trial court erred, and thus his federal constitutional right to present a defense, due process, and right to counsel were not implicated. (See *Zimmerman v. Superior Court* (2013) 220 Cal.App.4th 389, 396 [full benefit of right to counsel includes private and confidential communication with attorney].) On the record before us, Kocontes has not demonstrated Judge King erred by denying his motion to dismiss for outrageous government conduct by invading the defense camp.

## C. Juror Misconduct

Kocontes contends the trial court erred by denying his motion for mistrial based on juror misconduct and his request to excuse the offending jurors. Neither contention has merit.

### 1. Background

On the fifth day of testimony, before the jurors entered the courtroom, Kocontes made a motion pursuant to *Marsden, supra,* 2 Cal.3d 118, and the court cleared the courtroom to conduct a hearing. Gragg informed the court a bailiff "told the jury we're having a *Marsden* hearing in here," and that a sign on the courtroom door said, "Closed for *Marsden* Hearing." The court had the sign removed, recited what happened, and asked counsel to make a record. Gragg said she heard the statement and saw the sign while jurors were present. The prosecution heard the statement. They did not see the sign, but did not dispute it was on the door. The court ordered that no one mention the

*Marsden* hearing and cleared the courtroom to conduct the hearing; the court denied the *Marsden* motion.

Gragg moved for a mistrial on the ground one or more jurors would view Kocontes or counsel negatively. Without opposition from counsel, the trial court conducted a hearing. The court informed the jury it would question each juror individually and ordered them to not discuss the case or speculate as to the hearing's purpose.

Juror No. 376 saw the sign saying there was a hearing that started with an "M" but had no idea what it was. Juror No. 234 saw the sign and heard a male juror describe it as "a procedure where defendant wants to replace his or her attorney." Juror No. 343 heard the bailiff say something muffled but did not see the sign. This juror previously heard *Marsden* and heard it from other jurors that morning but did not know what it was.

Juror No. 164, a female juror, heard the bailiff mention the *Marsden* hearing and saw the sign. This juror knew what kind of a hearing it was "[b]ecause we looked to see what it was." Another female juror used her cell phone to search *Marsden* and said a *Marsden* hearing is "where the defendant can ask for a new attorney."

Juror No. 436 heard about a hearing and saw a sign. This juror did not remember the words, hear other jurors talking about it, or know what *Marsden* meant.

Juror No. 510 heard the bailiff mention the *Marsden* hearing and saw the sign. This juror looked up what it meant on his cell phone and said it was "a motion that a defendant can make to have a public defender removed from the case." This juror did not share the information with other jurors but thought "[a] couple people" he was near were "doing similar things."

Juror No. 468 heard the bailiff say there would be a delay and a word that started with "M" but did not see the sign or know what a *Marsden* hearing was.

61

Juror No. 250 heard there was a delay because of a *Marsden* hearing but did not see the sign and did not know what a *Marsden* hearing was. Juror No. 137 saw a "closed" sign but did not remember what the bailiff said and did not know what a *Marsden* hearing was. Juror No. 313 heard there was a hearing and saw a "closed" sign but did not know what a *Marsden* hearing was. Juror No. 460 heard the bailiff mention the *Marsden* hearing and saw the sign but did not know what a *Marsden* hearing was.

Juror No. 412 saw the sign that said *Marsden* and "Google[d] it." This juror learned it was about "replacement of an attorney."

Juror No. 502 heard the bailiff mention a hearing and saw a sign refer to a hearing but did not know what a *Marsden* hearing was. Juror No. 443 heard the bailiff mention a hearing and saw a sign refer to a hearing but did not know what a *Marsden* hearing was. Juror No. 356 did not hear the bailiff or read the sign but heard other jurors say *Marsden* and "[s]omething about with the lawyer." Juror No. 333 heard the bailiff mention the *Marsden* hearing, saw the sign that said *Marsden*, and heard other jurors talk about *Marsden*. When the trial court asked whether this juror knew what a *Marsden* hearing was, the juror answered, "I do not."

After questioning each juror, the trial court stated juror Nos. 376, 436, 468, 250, 137, 313, 460, 502, 443, and 333 did "not know what a *Marsden* hearing is, nor did they discuss it with other jurors." The court added juror Nos. 234, 164, 510, and 412 knew what a *Marsden* hearing was because they either looked it up or were told of its meaning. The court concluded juror Nos. 343 and 356 heard about a *Marsden* hearing but did not know what it was. The court conferred with counsel and had the court reporter read back the record to clarify any discrepancies. The court noted juror Nos. 164, 412, and 510 "actually went and looked [*Marsden*] up."

Gragg argued jurors' knowledge of a *Marsden* hearing could bias them against her and Kocontes and she could not "unring this bell." The prosecutor asserted that because the sign was outside the courtroom jurors did not commit intentional

misconduct in violation of the court's order and admonishing the jury was the proper remedy. Gragg responded it was "highly unlikely" the jury would forget "Kocontes tried to get rid of his lawyer."

The trial court opined it had to consider both the jurors' knowledge of the hearing as well as the fact the court conducted "an hour long *Marsden* hearing." The court added the following: "I believe the issue isn't misconduct with the possible exception of the three. I do feel that it is a question of can the jurors be significantly admonished and then both sides receiving a fair trial." The court recessed for lunch.

After the recess, there was a discussion of the relevant authority and additional argument. The court inquired of the prosecution how it could be confident the two or three jurors would obey additional instructions when it had disobeyed the court's previous instructions. The prosecution replied the jury had not been brought into the courtroom in the morning and it was unclear whether the *Marsden* hearing concerned this case.

The trial court questioned juror No. 164 further. This juror explained that after the bailiff said there was going to be a *Marsden* hearing, she and the other juror wondered what a *Marsden* hearing was and whether they could look it up. The other juror said she had her cell phone and would look it up.

Lastly, Gragg argued one or more jurors were being untruthful about what occurred and jurors were discussing it with each other. She added jurors would "draw a negative inference" against her or Kocontes. Gragg concluded the harm could not be cured by an admonition. The prosecutor asserted a curative instruction would be proper and there was no misconduct. The trial court denied Kocontes's mistrial motion reasoning that three jurors, juror Nos. 234, 343, and 356, learned what a *Marsden* hearing was, and a curative instruction was the proper remedy.

Gragg moved to exclude juror Nos. 164, 510, and 412. The trial court sought input from counsel concerning questioning the three jurors.

The trial court asked why juror No. 412 looked up *Marsden* on the internet in violation of the court's instructions and admonitions. This juror answered the following: "Well, I thought that since it was just a publicly placed bit of information, that, you know, if—I thought it would be okay. That's really my explanation."

When the trial court asked juror No. 510 the same question, this juror replied as follows: "Honestly, at the time, I guess my thinking was I saw it on the door and that you're not hiding the name, the type of hearing from us. I didn't think it was anything that we weren't supposed to know. In hindsight, I see that was certainly not correct, but other than that, I have gone out of my way to not see anything else." This juror had thought about it the last couple hours and was "not doing so hot right now."

The trial court asked juror No. 164 the same question. This juror explained that when the bailiff mentioned the *Marsden* hearing, she asked what it was and a person standing nearby said, "'It's something with the defendant changing the attorney.'" This juror said to the person next to her, "'I wonder what that is, I wonder if we could look it up,' and that's when she looked it up." When the court asked why this juror violated the court's instructions and admonitions the juror said, "To be honest with you, because I saw everybody leave, I really didn't think it had to do with this case because everybody walked out of this room."

In light of this additional information, the trial court revisited Kocontes's mistrial motion and tentatively denied it, concluding a curative instruction was proper. Based on the jurors' additional responses, the court was confident jurors would follow its instructions and there was no prejudice. After hearing from counsel, the court reaffirmed its ruling because it was "convinced" jurors could disregard the *Marsden* information and perform their duty by determining the facts and applying the law as instructed. The court added it had "drawn the conclusion that all 16 jurors will faithfully discharge their oath as jurors as it relates to being fair to both sides and following the [c]ourt's instruction." When the jury returned, the court again instructed the jury with CALCRIM No. 101,

64

"Cautionary Admonitions," and not to concern themselves with proceedings outside of their presence.

## 2. *Law and Analysis*

"The federal and state Constitutions guarantee a criminal defendant the right to a trial by an impartial and unbiased jury. [Citations.] A deprivation of that right can occur even if only one juror is biased. [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 98 (*Brooks*).)

"Juror misconduct, such as the receipt of information other than what is presented at trial, generally raises a rebuttable presumption of juror bias and that the defendant suffered prejudice. [Citations.]" (*Brooks, supra,* 3 Cal.5th at p. 98.) "[E]ven inadvertent exposure to out-of-court information may constitute misconduct giving rise to the presumption of prejudice. [Citations.]" (*Ibid.*) Jurors talking to each other about any subject related to the trial is juror misconduct that raises the presumption of prejudice. (*People v. Jackson* (2016) 1 Cal.5th 269, 332 (*Jackson*).)

"When a court becomes aware of possible juror misconduct, it must ""make whatever inquiry is reasonably necessary" to determine whether the juror should be discharged."" [Citation.] The nature of the court's inquiry may consist of a full hearing or informal questioning of the juror in the presence of counsel. [Citation.] 'The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion.' [Citation.]" (*Johnsen, supra,* 10 Cal.5th at p. 1170; § 1089 [trial court may discharge juror for good cause if juror unable to perform duty].)

"'[B]ias may appear in either of two ways: (1) if the extraneous material, judged objectively, is so prejudicial in and of itself that it is inherently and substantially likely to have influenced a juror; or (2) even if the information is not "inherently" prejudicial, if, from the nature of the misconduct and the surrounding circumstances, the court determines that it is substantially likely a juror was "actually biased" against the

defendant.' [Citation.] The surrounding circumstances include 'the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant.' [Citation.] '[W]e accept the trial court's findings of historical fact if supported by substantial evidence, but we review independently the question of whether prejudice arose from juror misconduct.' [Citation.]" (*Jackson, supra,* 1 Cal.5th at p. 332.)

"'[T]he presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant. [Citations.] Our inquiry in this regard is a "mixed question of law and fact" subject to independent appellate review. [Citation.] But "'[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'" [Citation.]" (*Brooks, supra,* 3 Cal.5th at pp. 98-99.)

Applying these principles, we conclude that although substantial evidence supports the conclusion three jurors committed misconduct, the presumption of prejudice was amply rebutted and the court did not err by refusing to declare a mistrial or by denying Kocontes's request to excuse the offending jurors.

Juror Nos. 164, 510, and 412 committed misconduct by using the Internet to research what *Marsden* meant. Beginning during jury selection, the trial court repeatedly instructed jurors to not use the Internet in any way connected with the case. Juror Nos. 164, 510, and 412 admitted to using the Internet to search *Marsden*.

The record is less clear concerning juror Nos. 234 and 333. Juror No. 234 said he saw the sign on the door and *heard* another male juror state a *Marsden* hearing is a procedure where a defendant wants to replace his attorney. Juror No. 333 said he heard the bailiff say, "It's a *Marsden* hearing," but he did not know what it was. There was no

evidence these jurors used the Internet to search *Marsden* or discuss *Marsden* after the *Marsden* hearing. Jurors are often in close proximity outside the courtroom door and overhearing another juror's statement does not establish they committed misconduct. Kocontes's claim "most of the jurors talked about the case" is not supported by the record.

Accepting the trial court's credibility determinations and factual findings, and in light of the circumstances surrounding the misconduct and the record as a whole, we conclude there was no substantial likelihood juror Nos. 164, 510, and 412 were actually biased against Kocontes. The evidence of misconduct consisted of three jurors learning about and having an isolated and cursory exchange about the purpose of a *Marsden* hearing. Two of the jurors thought it was public information because of the sign on the courtroom door, and one juror was unsure it concerned Kocontes's case. The misconduct was relatively mild based on the public nature of the disclosure. This was not a situation where jurors accessed the Internet to obtain information about Kocontes or the charged offense in violation of the court's orders. (*Jackson, supra,* 1 Cal.5th at p. 333 [citing cases and differentiating the matter from other types of juror misconduct].)

Additionally, the record includes no evidence any juror was biased against Kocontes or his counsel, or prejudged the case. The jurors' innocent reasons for looking up the term and varying recollections of any ensuing exchanges establishes the abbreviated research and discussion was insignificant. (*People v. Manibusan* (2013) 58 Cal.4th 40, 59 [juror's transitory comment about defendant's failure to testify were not prejudicial because they were "merely brief and passing observations"].) Moreover, because the trial court quickly learned of the sign and the bailiff's announcement, it was able to question the jurors and evaluate what occurred while the jurors' memories were

fresh.[22] It was the trial court that was in the best position to observe the jurors' demeanor and determine whether they were biased. (*Jackson, supra,* 1 Cal.5th at p. 334.) After conducting an extensive inquiry of the jurors, the court further admonished them to not research or discuss the case and to keep an open mind. And the court repeatedly admonished the jurors throughout the duration of the trial not to discuss the case, do any independent research, or form or express any opinions about the case. These admonitions were sufficient, and Kocontes's claim jurors violated other instructions is pure speculation. (*People v. Harris* (2013) 57 Cal.4th 804, 857 (*Harris*) [rejecting defendant's assertion of juror misconduct, we presume the jury understands and follows the trial court's instructions].) Indeed, one juror was so distressed by what he had done, he was not well, and he confirmed he had otherwise obeyed the court's instructions.

Finally, Kocontes asserts the jurors' knowledge of the *Marsden* hearing caused them to be bias against him and his counsel. This claim too is based on speculation. The evidence demonstrated several jurors knew what a *Marsden* hearing was and that one occurred. There is nothing about this information that indicates Kocontes was more likely to be guilty than not guilty. None of the jurors knew why Kocontes sought to replace his counsel. And the fact Kocontes and his counsel were in disagreement about something—even something important—would not tend to prejudice the jury against Kocontes. All the jurors knew was that a hearing occurred and that when it was over and trial continued, Kocontes was represented by the same attorney. At trial, the jury heard evidence Kocontes had numerous counsel since 2006. That some jurors

---

[22] Kocontes suggests the trial court failed to properly assess for prejudice because the court did not ask those who knew what a *Marsden* hearing was whether they could set that knowledge aside. The trial court retains discretion about what specific procedures to employ in investigating the possibility of juror bias or misconduct. (*Johnsen, supra,* 10 Cal.5th at p. 1170.) The court questioned all the jurors and then requestioned some of them. If Kocontes wanted the court to ask a specific question, he should have asked. (*Id.* at pp. 1169-1170 [defendant forfeits claim of prejudicial juror misconduct when counsel does not propose additional questions].)

learned he sought to replace the latest one was neutral information that was of no consequence.

In conclusion, although juror Nos. 164, 510, and 412 committed misconduct, based on an examination of the entire record, the inference of bias was rebutted. The trial court did not err by denying the mistrial motion and motion to exclude juror Nos. 164, 510, and 412, and reversal is not required. Thus, Kocontes's federal and state constitutional rights to an impartial and unbiased jury were not violated.[23]

## D. Evidentiary Claims

Kocontes raises four evidentiary claims. We address each in turn.

### 1. The 1999 Incident

Kocontes argues the trial court erred by admitting evidence of the nature of the 1999 incident. We agree.

### a. Background

In its motion in limine, the prosecution sought to admit evidence of a 1999 incident that caused Kocontes and Kanesaki to divorce and separate their assets. The prosecution asserted the evidence was relevant to provide background for their relationship at the time of the cruise and Kocontes's motive and opportunity to commit murder. The prosecution said the facts of the incident were not important but asked the court to review the report of the incident in camera to assist in deciding how to best refer to the incident. It proposed to refer to the incident as "a crime of moral turpitude involving inappropriate conduct with a female" and detailed the questions it would ask Price and Toshitaka.

In his written opposition that included a motion to seal, Kocontes stated it was sufficient if the jury was advised an event caused Kocontes and Kanesaki "to divorce

---

[23] We assume that after this mishap, bailiffs are trained to not post anything on the courtroom door other than "Courtroom Closed."

in order to protect assets from legal liability." He asserted evidence that he was arrested for and exonerated of misconduct was irrelevant, inflammatory, and potentially hearsay.

At a hearing, there was a lengthy discussion about whether the trial court had to review the report in camera and the prosecution's evidence. Gragg objected to the prosecution's description of the incident because the circumstances of the incident were irrelevant. Gragg asserted that if the court agreed with her description of the incident, it did not have to review the report in camera. The prosecutor agreed the details of the incident were irrelevant but countered Gragg's description was too sanitized because the nature of Kocontes's and Kanesaki's relationship was relevant. She explained the incident fundamentally changed their relationship, Kocontes's career, and Kanesaki's mental health. Gragg acknowledged a sanitized description explains why they were living together after the divorce. She added the only relevant information was they divorced to protect their assets. She added the details of the incident were unduly prejudicial and would consume undue time because the allegation was untrue and Kocontes recovered in a civil suit against the complaining party. The prosecutor responded Gragg's description was inadequate because it was relevant the incident involved another woman and "would rock the fundamental structure of a marriage." The court indicated it would review the report during the lunch recess and address the issue that afternoon.

When the hearing resumed, the trial court stated it had reviewed the documents and questioned the prosecutor about the evidence's relevancy and admissibility. Gragg contended evidence Kanesaki was angry at Kocontes about the 1999 incident was irrelevant to the prosecutor's theory Kocontes killed Kanesaki for financial gain. She added evidence Kocontes committed a crime of moral turpitude against a female was "obvious[ly] prejudi[cial]" and the best case scenario would be if the jury concluded he raped someone. The prosecutor added financial gain need not be

70

the sole motive and it was possible Kocontes was upset with Kanesaki because she "never got[] over that incident."

The trial court ruled evidence of the 1999 incident was relevant to explain Kocontes's statements to Price and others. Citing to Evidence Code section 352, the court ordered the jury could not hear evidence there was a "crime" and Kocontes was arrested. The court allowed the prosecutor to ask, "Are you aware of an incident in 1999 where there was an allegation that the defendant was involved in an inappropriate relationship with a female?"

Later, Gragg revisited the issue and requested the language be modified to state "unadjudicated allegation" to avoid the implication Kocontes "was guilty of the conduct." The prosecutor objected because "inappropriate" did not necessarily mean legally inappropriate.

The trial court reaffirmed its ruling. The court stated whether the allegation was true or not was immaterial. The court explained the evidence was relevant as to Kocontes and Kanesaki's relationship. The court added the statements were not inadmissible hearsay or privileged. The court concluded there was no danger the jury would use the evidence for an improper purpose because (1) it performed the Evidence Code section 352 weighing, and (2) it ordered the prosecution to use the specific language.

At trial, several witnesses testified they were aware of a 1999 incident that caused Kocontes and Kanesaki to separate their assets and fundamentally altered their relationship. As relevant here, the prosecutor asked Stokes whether Kocontes told him that around 2000 someone alleged he engaged in "inappropriate sexual conduct with a female." Stokes replied affirmatively. The prosecutor asked Price whether he was aware that in 1999 someone alleged "[Kocontes] was involved in an inappropriate relationship with a female." Price responded affirmatively.

71

*b. Law and Analysis*

"'No evidence is admissible except relevant evidence.' (Evid. Code, § 350.) 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."' [Citation.]" (*People v. Hardy* (2018) 5 Cal.5th 56, 87 (*Hardy*).)

"'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) 'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.' [Citations.]" (*Hardy, supra,* 5 Cal.5th at p. 87.) An abuse of discretion means the trial court acted in an arbitrary, capricious, or absurd manner that resulted in a manifest miscarriage of justice. (*People v. Miles* (2020) 9 Cal.5th 513, 587-588.)

"'When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled.' [Citation.]" (*People v. Coddington* (2000) 23 Cal.4th 529, 618, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 (*Price*).)

Here, the prosecution alleged Kocontes killed Kanesaki for financial gain. At trial, the parties agreed, as do we, that evidence there was a 1999 incident that caused Kocontes and Kanesaki to divorce and split their assets to protect against civil liability

72

was relevant.[24]  This was consistent with evidence that after Kocontes and Nguyen divorced in September 2005, Kocontes returned to Kanesaki and they executed wills making each other sole beneficiaries.  This evidence, and other evidence Kocontes was obsessed with money, supported the prosecution's theory Kocontes's motive for killing Kanesaki was financial.

What was not relevant was additional evidence about why they divorced. Over Kocontes's objection, the trial court allowed the prosecution to ask whether the incident involved an "inappropriate relationship with a female."  The prosecutor asked Stokes whether it involved "inappropriate sexual conduct with a female."  The prosecutor asked Price whether "[Kocontes] was involved in an inappropriate relationship with a female."  Evidence they divorced to protect their assets was relevant, but evidence about why they divorced was not.  We acknowledge the trial court has wide discretion in determining the admissibility of evidence.  (*Guillen, supra,* 227 Cal.4th at p. 1019.)  But here, the court opined evidence of details as to why they divorced was relevant to explain Kocontes's statements to Price and others.  We agree with Kocontes this reasoning was circular.  The fact Kocontes told Price, and Stokes, why they divorced does not make the statement relevant.  The evidence must be relevant to some material fact in issue. Additional evidence of the cause of their divorce was not relevant.

Additionally, evidence of the details as to the cause of their divorce was unduly prejudicial.  The jury heard that Kocontes engaged in inappropriate sexual conduct with a female that caused them to divorce to protect their assets from civil liability.  There was evidence Kocontes and Kanesaki had considerable financial assets.

---

[24]  In his reply brief, Kocontes asserts the fact they "divorce[d] to shield half the assets from civil liability is not relevant."  This is not what he argued in his opening brief.  And Gragg conceded this was relevant below.  He cannot argue this for the first time on appeal.  (Evid. Code, § 354; see *People v. Woodward* (2004) 116 Cal.App.4th 821, 832 [theory of relevancy argued on appeal different than that offered during trial waives review of issue].)

From this evidence, the jury could reasonably conclude Kocontes engaged in significant sexual misconduct that caused him and his wife to take the bold step of divorcing to protect their assets.  This evidence would uniquely tend to evoke an emotional bias against Kocontes.  (*People v. Chhoun* (2021) 11 Cal.5th 1, 29.)  We disagree with the Attorney General the jury would conclude it was an "extramarital affair"—extramarital affairs do not generally result in civil liability nor do they give rise to a civil suit by parents.  Thus, because evidence of the additional details of the cause of their divorce lacked relevancy and was unduly prejudicial, the trial court abused its discretion by admitting it.  We will address whether the court's error requires reversal.

## 2.  *Price's Testimony*

Kocontes argues the trial court erred by denying his mistrial motion after Price offered irreparably prejudicial testimony.  We disagree.

## a.  *Background*

During direct examination, the prosecutor asked Price if he was "aware of an incident in 1999 where there was an allegation that [Kocontes] was involved in an inappropriate relationship with a female."  After Price said, "Yes," the following colloquy occurred:

"[Prosecutor]:  Did [Kocontes] tell you what he decided to do regarding his marriage as a result of that incident?

"[Price]:  Yes.

"[Prosecutor]:  What did he tell you?

"[Price]:  He indicated that he and [Kanesaki] would divorce because his main consideration was --

"[Counsel]:  I'm sorry.  I'm going to object and move to strike after 'because' unless it's a statement by [Kocontes].

"[Trial court]:  The objection is overruled.  [¶] I'm going to have the reporter read the question and the answer, and then you may continue with the answer.

74

"[¶] . . . [¶]

"[Price]: -- being civilly sued by the parents.

"[Prosecutor]: I'm going to interrupt you for a moment. Was he concerned that there was going to be a lawsuit and he needed to protect his assets?

"[Price]: Yes.

"[Prosecutor]: Did he tell you whether they separated their assets as a result of him being concerned about a civil lawsuit?

"[Price]: Yes."

A little later, when asked, Price confirmed he helped Kocontes with a matter concerning Bujanowski. The following colloquy occurred:

"[Prosecutor]: And do you recall, did things go well for [Kocontes] in regards to that litigation?

"[Counsel]: Objection. Relevance.

"[Trial court]: The objection will be sustained.

"[Prosecutor]: Do you recall having a conversation with him in jest regarding getting rid of Bujanowski?

"[Counsel]: I'm going to object.

"[Trial court]: The objection at this time will be -- I'm sorry. Grounds, relevancy?

"[Counsel]: Yes.

"[Trial court]: Sustained."

After the trial court released the jurors for lunch, it requested the prosecutor provide an offer of proof concerning the last question. The prosecutor stated that sometime after Kanesaki's death, Price suggested to Kocontes that he take Bujanowski on a cruise. Kocontes replied, "he used to have connections with people who could take care of that." Gragg responded Price later gave a different version of the statement and Kocontes did not say anything about a cruise. The court overruled the objection. The

75

court explained the prosecution had to demonstrate it was an adoptive admission, and if it did, the court would instruct the jury on the foundational requirements. The court opined the statement's relevancy would not be substantially outweighed by its prejudicial effect.

That afternoon, the prosecutor asked Price if he remembered telling Kocontes that he should "take . . . Bujanowski on a cruise." Price remembered making the statement but did not remember Kocontes's response. After he refreshed his recollection with a report, the following colloquy occurred:

"[Prosecutor]: When you said maybe you should take Bujanowski on a cruise, what was [Kocontes's] response?

"[Price]: That he would have to find somebody or some of the people that he knew.

"[Prosecutor]: Do you remember him saying he used to have connections with people who could take care of that?

"[Price]: Yes.

"[Prosecutor]: And do you remember asking him what he meant by that and what his response was?

"[Price]: Yes.

"[Prosecutor]: And what was his response?

"[Price]: That he had known people from previous encounters with his in -- when he was incarcerated from the past.

"[Counsel]: I'm sorry. I'm going to object."

Outside the presence of the jurors and Price, Kocontes's moved for a mistrial on the grounds the jury heard evidence (1) the 1999 incident involved a minor female because Price mentioned "parents" and (2) Kocontes had been incarcerated. The court noted it overruled the objection that morning because it thought the evidence concerned a conversation about a cruise not about being incarcerated. The prosecutor noted what Price said was not in the report.

76

As to Price's reference to "parents," the trial court noted Gragg did not object. The court also noted the prosecutor "appeared to cut the witness off after the word 'parents.'" The prosecutor stated she moved "quickly" away from the subject and the record is confused on this point because there were no details about who the parents were. The prosecutor was not opposed to striking the testimony and giving a curative instruction.

The trial court denied the motion for a mistrial because "these two areas can be cured." The court reversed itself and sustained the objection concerning the Bujanowski conversation. The court indicated it would instruct the jury "to disregard any information about a conversation between [Kocontes] and [Price] concerning . . . Bujanowski." The court stated it would have the reporter read Price's answer regarding the 1999 incident, but stop with "'being civilly sued,'" and direct the jury to disregard any comment after that. The court struck the reference to "parents" for any readback of testimony. The court concluded it would admonish Price to "answer only the question."

Gragg did not object to the trial court's approach to the Bujanowski matter but asserted "that's a huge bell to unring." She stated she did not object or move to strike the reference to "parents" to avoid calling attention to it "given that it was relatively brief." Gragg requested the court not have it readback to avoid highlighting it and agreed to instruct the reporter to strike the reference to "parents."

Before the jurors returned, the trial court admonished Price to answer questions directly and not mention Kocontes was incarcerated. When the jury returned, the court stated testimony concerning the Bujanowski conversation was stricken from the record and admonished the jury to not consider it for any purpose.

b. *Law and Analysis*

"'"'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested

77

with considerable discretion in ruling on mistrial motions. . . .' [Citation.] A motion for a mistrial should be granted when ""'a [defendant's] chances of receiving a fair trial have been irreparably damaged.'"'" [Citation.] "Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." [Citation.]' [Citation.]" (*Harris, supra,* 57 Cal.4th at p. 848.)

Here, there is no dispute the trial court properly struck Price's offending statements from the record. The court admonished the jury it could not consider the information about Price's conversation with Kocontes concerning Bujanowski. The court also struck from the record Price's reference to "parents," although it complied with Gragg's request to not admonish the jury to disregard it to avoid highlighting the reference. The issue is whether the trial court's curative instructions were adequate.

Relying on *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*), and other cases, Kocontes argues the prejudice was too great to be cured by the trial court's instructions. In *Bruton*, the United States Supreme Court addressed the issue of whether defendant's conviction at a joint trial should be reversed although the trial court instructed the jury to disregard codefendant's confession that inculpated defendant. (*Id.* at pp. 123-124.) In addressing whether the prejudice was too great in that case, the Court stated the following: "Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. 'A defendant is entitled to a fair trial but not a perfect one.' [Citations.] It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information. Nevertheless, . . . there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. [Citations.]" (*Id.* at p. 135.) In other

78

words, despite the trial court's curative instructions, "'"'"You can't unring a bell."'"'" (See *People v. Diaz* (2014) 227 Cal.App.4th 362, 383-384.)

Here, the trial court did not abuse its discretion by denying Kocontes's mistrial motion. Price's passing references to "parents" did not warrant a mistrial. As the court indicated, when Price said "parents," the prosecutor quickly interrupted Price and redirected him by asking another question. Gragg's strategic decision to not object kept the jury from focusing on the unanticipated remark. Additionally, the court struck "by the parents" from the record to ensure the jury would not hear the remark during any readback. Price's brief, isolated mention of "parents" did not incurably prejudice Kocontes.

Similarly, Price's testimony about his conversation with Kocontes concerning Bujanowski did not incurably prejudice Kocontes. Although "evidence a defendant committed an offense on a separate occasion is inherently prejudicial[,]" (*People v. Tran* (2011) 51 Cal.4th 1040, 1047), brief and ambiguous statements concerning a defendant's incarceration can be cured by the trial court's admonition (*People v. Collins* (2010) 49 Cal.4th 175, 198-199 [witness's brief and ambiguous remarks concerning defendant's prison telephone calls not incurably prejudicial requiring mistrial]).

Price testified Kocontes had been incarcerated and Kocontes had "connections with people who could take care of" Bujanowski. Juries frequently hear unsolicited and inadmissible statements and for trials to continue, it is axiomatic trial courts may cure any prejudice by admonishing the jury. (*People v. McNally* (2015) 236 Cal.App.4th 1419, 1428-1429; *People v. Martin* (1983) 150 Cal.App.3d 148, 163.) That is what the trial court did here. The court struck Price's testimony concerning the Bujanowski conversation and admonished the jury to disregard it. Thus, the jury would not "inevitably" conclude he was incarcerated for the 1999 incident or that he had a propensity to commit murder. We presume the jurors followed the admonishments and

79

instructions. (*Bruton, supra,* 391 U.S. at p. 124; *People v. Molano* (2019) 7 Cal.5th 620, 676.) The court's admonition was sufficient to cure any prejudice from Price's unsolicited and isolated remarks. (*Alexander, supra,* 49 Cal.4th at p. 915 [trial court's admonition cured any prejudice from witness's statement defendant committed prior triple murder and denial of mistrial motion not abuse of discretion].)

Kocontes relies on four cases to support his contention Price's statement he was previously incarcerated was incurably prejudicial. In the first case, *People v. Navarrete* (2010) 181 Cal.App.4th 828, 831, 834, 838, the court reversed defendant's conviction after a detective testified concerning defendant's inadmissible statement in a manner that suggested defendant confessed to the crime finding the trial court's admonition insufficient to cure the prejudice. Here, Price's testimony on this point did not concern Kocontes's confession.

But three of the cases involved a prosecutor's misconduct and/or were extremely close cases. (*People v. Allen* (1978) 77 Cal.App.3d 924, 934-935 [conviction reversed where rebuttal witness testified defendant on parole in extremely close case]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 342 [conviction reversed where prosecutor intentionally elicited witness's statement defendant an ex-convict in close case]; *People v. Figuieredo* (1955) 130 Cal.App.2d 498, 505-506 [conviction reversed where prosecutor intentionally elicited witness's statement defendant had been in San Quentin].)

We are not concerned here with a prosecutor's misconduct. And as we explain below, this was not a close case.

Based on the record before us, the trial court's admonitions and instructions cured any prejudice caused by Price's unsolicited and isolated statements. Thus, the court did not abuse its discretion by denying Kocontes's motion for a mistrial.

*3. Kanesaki's Blood Test*

Kocontes contends the trial court erred by admitting evidence Kanesaki's blood tested negative for alcohol because it was inadmissible and violated his federal constitutional rights. We agree.

*a. Background*

During direct examination, Ricci testified he conducted toxicology tests on Kanesaki with a laboratory affiliated with the institute at his university. He reviewed the results and stated the testing had been performed in accordance with his training. When the prosecutor asked whether Kanesaki's body was tested for alcohol, Gragg objected on foundational and hearsay grounds, and the court excused the jurors.

The trial court concluded there was sufficient foundation and overruled that objection. Gragg stated that based on "the one-page report [she] received," there was a "foundational issue" whether Ricci could testify the chemist performed the test "appropriately" because Ricci was not present at the test. She added her foundational objection was she did not have any "gas chromatograph results" to determine whether the chemist performed the test "correctly." After counsel argued, the court ordered the prosecutor to not question Ricci on the toxicology tests until the court conducted further research on the hearsay and *Crawford v. Washington* (2004) 541 U.S. 36, issues. The court did not rule on Gragg's hearsay objection.

Later, during a break in Ricci's cross-examination, the trial court cited to the relevant authority and said there were two issues, hearsay and foundation. The court indicated it overruled the foundation objection and sustained the hearsay objection. The court said the following: "I think the court was in error. I think it should be the opposite." The court explained its intention to sustain the foundation objection and overrule the hearsay objection because testimony about the negative toxicology test was "non-testimonial and not in violation of the confrontation clause."

81

Gragg asserted that if Ricci actually reviewed the "raw data" and formed an independent opinion, that would be admissible but the foundation was inadequate.  After the court drew a distinction between cases where the tests revealed a numerical quantity and this case where there was an "absence of the fact," Gragg responded "a negative result is the same thing as a positive result."  Relying on *People v. Lopez* (2012) 55 Cal.4th 569, the court ruled the prosecutor could question Ricci about the negative test assuming the prosecutor laid sufficient foundation and the court would allow "wide latitude on cross-examination."

On redirect examination, Ricci testified he was an expert in toxicology and agreed he was familiar with the mechanisms and processes to test for substances in the body.  He stated the test was performed at a certified public laboratory.  Ricci reviewed the reports and "verified the type of analysis that was performed" and "discussed the results of it with the chemist who performed the tests."[25]  He believed the chemist followed all industry-accepted practices, and he had no concerns about the reliability of Kanesaki's test results.  Ricci detailed the two-step process to test for alcohol, which involved first an "immunoenzymatic technique" and second "gas chromotography with detector head space."  He said the first step involved making a hydrolysis of the blood or urine sample and using a kit to test antigen reactions with a machine.  He had used a gas chromotographer, understood how the machine worked, and explained how to interpret the results.  He said Kanesaki's blood and urine were tested.  When the prosecutor asked if the results of the first step revealed any alcohol in Kanesaki's blood or urine, the court overruled Gragg's unspecified objection.  Ricci stated Kanesaki's blood and urine samples tested negative for alcohol.  He added that because the first step was negative the second step was unnecessary.

---

[25]     The prosecution did not admit the report(s) into evidence.

On recross-examination, Ricci stated the first step was conducted by adding the blood or urine sample to a pre-made testing kit purchased from suppliers. He explained the sample was added to an antigen and antibody mixture that produced a numerical result on a machine. Ricci did not personally put the sample in the kit, put the kit in the machine, look at the results of the preliminary test, or review the machine's calibration records. He did not personally observe the test. Gragg asked, "If you assume someone had a glass of wine at 8:00 o'clock, you would assume that wine would be out of their system, non-detectable, after an hour; correct?" Ricci responded, "Yes."

*b. Law and Analysis*

*i. Foundation*

The proponent of the evidence must demonstrate the correct scientific procedures were used. (*People v. Jones* (2013) 57 Cal.4th 899, 936.) This requires a showing of the reliability of the testing instrument, the proper administration of the test, and the competence of person performing the test. (*Ibid*.) In general, the foundational requirements for establishing the reliability of test results consist of a showing (1) the apparatus utilized was in proper working order, (2) the test used was properly administered, and (3) the operator was competent and qualified. (*Delgado v. Department of Motor Vehicles* (2020) 50 Cal.App.5th 572, 577.) We review a trial court's conclusion there was adequate foundation for an abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266, 273.)

The Attorney General asserts Kocontes's forfeited appellate review of this issue. Nonsense. Gragg's primary objection was there was inadequate foundation concerning the toxicology report because Ricci was not present when the chemist performed the test and thus lacked knowledge it was done properly. The issue is not forfeited.

*People v. Williams* (2002) 28 Cal.4th 408 (*Williams*), is illustrative of the showing required to demonstrate the foundation for scientific testing. In *Williams*, our

83

Supreme Court explained breath test results are admissible upon proof of compliance with either title 17 of the California Code of Regulations or "the foundational elements of (1) properly functioning equipment, (2) a properly administered test, and (3) a qualified operator." (*Id.* at p. 417.) The court stated the prosecution must "'qualify the personnel involved in the test, the accuracy of the equipment used and the reliability of the method followed before the results can be admitted.'" (*Id*. at p. 416.) In analyzing the facts of that case, the court opined that notwithstanding the failure to conform to the requirements of title 17 of the California Code of Regulations, the trial court did not abuse its discretion by admitting the numerical results of the PAS test because there was evidence supporting the three foundational elements. (*Id*. at p. 417.) The court explained that although the testing device was not tested with the frequency demanded by the regulations, it always performed within the acceptable range. (*Ibid*.) The court added the officer utilized the procedures that he had been taught in administering the test. (*Id*. at p. 418.)

Here, there was insufficient evidence supporting the three foundational elements for the toxicology test results to be admissible. There was evidence a chemist in a certified Italian lab tested Kanesaki's blood and urine and Ricci, who was not present for the test, reviewed the results and talked to the chemist and opined the chemist followed industry-accepted practices and the test was reliable. Unlike in *Williams*, this was insufficient foundation. The chemist who performed the test did not testify. There was no evidence of the following: the machine was functioning properly, the chemist was qualified to operate the machine, and the chemist properly performed the test. Gragg could not cross-examine the chemist on these matters to challenge whether the test result was reliable. Gragg was placed in the untenable position of trying to dispute the reliability of the test by questioning a person who did not perform or observe the test.

Finally, the trial court's rational that somehow a "0" result was different from a numerical result is nonsensical. The prosecution was trying to undermine

84

Kocontes's anticipated testimony Kanesaki was intoxicated. That Kanesaki's blood and urine tested negative for alcohol was as relevant as a driver whose blood alcohol tested above 0.08 percent.

The trial court erred by overruling Kocontes's objection on foundation grounds to Ricci's testimony concerning the toxicology report. The court abused its discretion by admitting this evidence. We will address whether the court's error was prejudicial below.

*4. Kanesaki's E-mails to White*

Kocontes argues the trial court erred by admitting Kanesaki's e-mails to White. He adds, "Most of the e[-]mails that the court allowed under the state of mind exception were inadmissible." But he only addresses e-mails from March 2, 2005. Kocontes's failure to provide any legal reasoning or analysis on each individual evidentiary objection results in forfeiture of his claims. (*People v. Stanley* (1995) 10 Cal.4th 764, 793 [it is not the role of reviewing court to independently seek out support for appellant's conclusory assertions, and such contentions may be rejected without consideration]; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 546 [appellate court does not serve as "backup appellate counsel" or make parties' arguments for them].) Thus, we limit our discussion to the March 2, 2005, e-mails.

*a. Background*

In its motion in limine, the prosecution sought to admit Kanesaki's e-mails to White pursuant to the state of mind exception to the hearsay rule (Evid. Code, § 1250). As relevant here, the prosecution sought to admit March 2, 2005, e-mails that described Kanesaki's concerns with Kocontes's "attempts to control her parents['] money" and his "obsession with money." The prosecution argued the information was admissible to show Kanesaki's "attitude towards [Kocontes]," and her "state of mind regarding financial plans."

Kocontes filed a written objection. He argued the March 2005 e-mails had no relevance to whether he murdered Kanesaki over a year later.

At the hearing, the trial court cited to *People v. Noguera* (1992) 4 Cal.4th 599, heard from and questioned counsel, and analyzed each proffered e-mail. The prosecutor argued Kanesaki's state of mind concerning her financial assets was relevant to the special circumstance and motive. She added Kanesaki did not trust Kocontes and wanted to keep her assets separate from him. Gragg asserted that generally Kanesaki's intentions were irrelevant unless Kocontes was aware of them.

As to the March 2, 2005, e-mails specifically, the prosecution contended the evidence was relevant because they were arguing about finances. Gragg argued the e-mails were not state of mind evidence because she did not act "in accordance with that view of his values." She asserted the evidence had little relevance because Kocontes left Kanesaki a couple months after the e-mails. She added to the extent it was relevant to state of mind, it was unduly prejudicial pursuant to Evidence Code section 352. Before the court recessed for the evening, it asked the prosecution to be prepared "to articulate the relevant state of mind of [Kanesaki] in this case that's at issue." The prosecutor responded there was evidence Kocontes told Price and Nguyen he returned to Kanesaki because of finances. Gragg clarified those statements concerned the house, but the e-mails in question concerned Kanesaki's parents' money and not Kocontes and Kanesaki's house.

The next day, the trial court admitted portions of the e-mails. Relying on *People v. Ortiz* (1995) 38 Cal.App.4th 377 (*Ortiz*), the court opined Kanesaki's "attitude was towards [Kocontes] at the time of the killing as it relates to finances" was relevant, admissible pursuant to Evidence Code section 1250, and not unduly prejudicial pursuant to Evidence Code section 352. As relevant here, the court admitted portions of Kanesaki's e-mails to White on March 2, 2005.

At trial, the prosecutor asked White about the March 2, 2005, e-mails. In one e-mail, Kanesaki wrote the following: "With L and me, our core values in life are so different, not even close. His values: money, job, & health. My values: health, no hassles/peace of mind, quality of life (meaning making some of my most important dreams/goals come true), & money/income. . . . After the past few weeks of arguing with LK, I have decided to cut-off his access to my parents' money. He even tries to control their money. [¶] . . . [¶] . . . I can't even buy any big ticket items because LK doesn't want to spend the money . . . . I have to put up a big fight/argument before I can buy anything for my house. . . . He thinks I should do exactly as he says. HA! Is he a Neanderthal man or what??? . . . [¶] I know all of his sneaky tricks. He tries to throw a few bones (carcass) at me so as to distract me from getting what I really want. . . . And he doesn't want to separate because he'll lose out ½ of the assets immediately. This makes him sick to his stomach."[26] White agreed Kanesaki shared her frustrations with Kocontes's control issues with money.

The trial court instructed the jury Kanesaki's e-mails were allowed "for a limited purpose, and the purpose for which you're allowed to consider it is the state of mind of [Kanesaki] at the time that the e-mails were made. You're not to consider it for any other purpose."

*b. Law and Analysis*

In *Ortiz, supra,* 38 Cal.App.4th at pages 389-390, the court explained a declarant's present state of mind can be admitted under two different theories: (1) as hearsay under the Evidence Code section 1250 exception for the declarant's present state of mind, and (2) as nonhearsay circumstantial evidence of a declarant's state of mind. The court stated that in both situations the evidence must be relevant (*id*. at p. 389), and not inadmissible pursuant to Evidence Code section 352 (*id*. at pp. 391-392). The parties

---

[26]     We quote the e-mail without corrections.

focus on whether Kanesaki's March 2, 2005, e-mail to White was admissible pursuant to Evidence Code section 1250—whether Kanesaki's state of mind was at issue, i.e., was it relevant to Kocontes murdering her for financial gain?  But we think there was a more fundamental problem.

Assuming for the sake of argument Kanesaki's statements to White that Kocontes feared losing 50 percent of his assets was relevant to Kocontes's intent absent evidence he was aware of her statements (*Hardy, supra,* 5 Cal.5th at p. 87 [relevant evidence tendency to prove disputed fact at issue]), we think any probative value was outweighed by its likelihood of confusing, misleading, and distracting the jurors.  This e-mail was remote.  Kanesaki sent the e-mail in question on March 2, 2005.  Kocontes and Kanesaki did not set sail until May 2006.  Kanesaki's state of mind as to their financial situation in March 2005 was not particularly probative 14 months later.  Thus, the trial court abused its discretion by admitting the March 2, 2005, e-mail.  We will address whether the court's error was prejudicial below.

*E.  COVID-19 Pandemic*

Kocontes argues the trial court erred by denying his motions for a mistrial and continuance because the courtroom configuration after the COVID-19 pause interfered with jurors' ability to assess witness demeanor, his ability to communicate with Gragg, and his right to a public trial in violation of the federal constitution.  None of his contentions have merit.

*1.  Background*

The prosecution called its first witness on February 10, 2020,[27] and rested on March 4.  Kocontes called his first witness on March 9 and called additional witnesses over the following two days.  On Thursday, March 12, the trial court first discussed COVID-19 and indicated they were in department C45, which it believed was "the largest

---

[27]     All dates are from the year 2020.

courtroom." The court articulated the precautions it planned to implement when the jury returned on Monday, March 16 and for the remainder of the trial. Gragg indicated the only anticipated witness on Monday would be Kocontes.

On Monday, March 16, the trial court explained it had spoken with counsel and that based on the COVID-19 pandemic, there were two options: proceed with trial with jurors seated in compliance with Centers for Disease Control and Prevention (CDC) recommendations; or take a break. The prosecutor, Gragg, and Kocontes agreed to the break. After jurors returned, the court informed them they were taking a break because of the pandemic, placed them on one-day on-call status, and ordered them back on Monday, April 6. The court admonished jurors to not do any independent research, read any articles about the case, discuss the case with anyone, or form any conclusions about the case.

Beginning that day, and for months, the COVID-19 pandemic caused California officials to issue a flurry of orders to continue to provide essential government services, safeguard constitutional rights, and protect people from COVID-19. The effect of some of those orders was jury trials could not proceed. (See *People v. Breceda* (2022) 76 Cal.App.5th 71, 81-84 (*Breceda*) [detailing Chief Justice's, Governor's, and Presiding Judge's orders].)

On April 1, the trial court and counsel had a conference call. The prosecution requested trial resume, but Gragg objected. The court concluded good cause did not exist to resume trial. The following week, the court modified its order and cited to Governor Gavin Newsom's, the Judicial Council's, Chief Justice Tani Cantil-Sakauye's, and Presiding Judge Kirk Nakamura's orders as authority for denying the prosecution's request to resume trial. The court set Friday, May 22, to resume trial pursuant to the Chief Justice's order; the court clerk provided notice to the jurors. The court conferred with counsel and the clerk communicated with jurors over the following weeks.

On Tuesday, May 26, the trial court conducted a hearing with counsel physically present in the courtroom and cited to the emergency orders. The court noted courtroom capacity had gone from 140 to 24,[28] and everyone was socially distanced and wearing a mask. The court indicated it had to address COVID-19 health measures, Kocontes's right to a public trial, and the media's right to cover the trial. As to media access, the court noted it previously allowed one national news outlet and one local newspaper photographer into the courtroom. The court denied the media's right to be present in the courtroom but granted the national news outlet's request to livestream the proceedings.

With respect to public access, the trial court stated, "[w]e are in, for lack of a better word, a different era than we were before the court was closed down." The prosecutor asserted livestreaming satisfied the public access requirement. Gragg disagreed because not all people have the technological means to livestream the proceedings. Citing to *Waller v. Georgia* (1984) 467 U.S. 39 (*Waller*), the court explained denial of a public trial is a structural error but the right is not absolute. Gragg replied one seat did not comport with the constitutional right to a public trial. After a short recess to research the issue, she requested the matter be continued until the public could enter the courtroom. The court clarified that because of miscalculations there were eight available seats for the public and it would consider any requests from the public to be present in the courtroom. Gragg did not dispute there were eight seats available to the public. The court overruled Kocontes's objection and restricted the public's access to the courtroom. The court took judicial notice of the Governor's and the Chief Justice's orders and found COVID-19 was a deadly virus that caused loss of life but the "[t]he rule of law must proceed." The court concluded that with livestreaming and allowing the

---

[28] The trial court and counsel noted 23 of the 24 seats were accounted for by Kocontes, court staff, prosecutors, Gragg and one support staff, jurors, and Kanesaki's brother and his wife. No one from Kocontes's family requested to be present.

parties to designate who they wanted to be present in the courtroom, restricting public access and proceeding with the trial was proper.

As to the courtroom configuration, the trial court detailed how the courtroom layout had changed to accommodate social distancing guidelines. The court noted that prior to the pause in proceedings, one juror was seated 27 feet from where the witnesses had been testifying. The court described where jurors would be seated to maintain social distancing as follows: four in the jury box; one in the well; and 11 in the audience ranging from 10 feet to about 45 feet from the witness stand. The court explained it previously tested the seating configuration and jurors would have an unobstructed view of the witness stand; the court prepared and marked an exhibit, exhibit No. 11, showing the seating configuration. The court indicated witnesses must remove their masks when testifying so jurors could assess their demeanor.

The prosecution did not object to the courtroom configuration. Kocontes moved for a mistrial. Gragg argued the passage of time would negatively impact the jurors because this was a complex credibility driven case. She contended the distance and mask requirements interfered with her right to communicate with hearing-impaired Kocontes, and her ability to move and examine witnesses was limited so as to not obstruct jurors' sight lines. She added the "crux" of her argument was these limitations only affected the key defense witness, Kocontes, and not the prosecution's witnesses and it violated his right to a fair trial and due process. Gragg requested a mistrial so the case could proceed on "a level playing field." Alternatively, she requested a continuance although it was uncertain when conditions would improve. She acknowledged this complicated her argument jurors' memories faded.

The prosecutor replied that delays and lengthy trials were not unique. She proposed allowing for breaks to allow Gragg and Kocontes to communicate. She noted Kocontes had been writing notes and sharing them with Gragg during this proceeding.

91

She also suggested the attorney who was questioning a witness not be required to wear a mask. The court said it would review the applicable cases during the lunch recess.

That afternoon, the trial court allowed counsel to offer additional argument. Gragg asserted the "synergistic effect" of the social distancing requirements rendered the defense case "enormously different" from the prosecution case in violation of Kocontes's due process rights. When the court inquired of counsel how her ability to communicate with Kocontes would be impacted because he would be on the stand, Gragg cited to the prosecution's presentation of the solicitation case. The prosecutor offered creative measures to mitigate concerns and highlighted the detrimental impact of further delay because it was likely social distancing and masks would "be a reality in the court system" for a long time. Gragg agreed the health measures may be the "new normal" but the defense had to present its case under "constraints" the prosecution did not have to contend with.

The trial court stated there were two components to the mistrial motion, the delay and the courtroom configuration. The court said it was unclear when things would return to normal and the criminal justice system had to continue. The court stated the passage of time was an insufficient basis to grant a mistrial because counsel would recite the evidence during closing argument and the jury could ask for a readback of testimony. As for the courtroom configuration, the court acknowledged it was different but stated it would ensure the jurors have an unobstructed view of the testifying witness. After stating it was using juror No. 1 as the benchmark, the court added "when [it applied] that to the other jurors, at most what [it was] dealing with [was], perhaps, another 10 feet, maybe 10 feet at the most." The court concluded social distancing would not deprive jurors of observing the witness's demeanor. Later, the court told Gragg to let it know any time she needed to speak with Kocontes confidentiality. The court did not expressly rule on Kocontes's continuance request, but proceedings resumed two days later.

92

On May 28, before jurors entered the courtroom and trial resumed, the trial court granted counsel's joint request to allow the examining attorney not to wear a mask. There were eight available seats to the public and the case was being livestreamed. The court welcomed the jurors and informed them of the health protocols and courtroom configuration. The court advised them the same admonitions applied and ordered them to not view the livestream if it could be recorded. After acknowledging COVID-19 substantially changed people's lives, the court asked if anyone could not give Kocontes and the prosecution a fair trial under the changed circumstances. The court noted no juror raised their hand. Kocontes testified as previously described.

2. *Law and Analysis*

"A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. [Citations.] 'It is well settled that legal necessity for a mistrial "arises from an inability of the jury to agree, or from physical causes beyond the control of the court, such as the death, illness, or absence of judge or juror, or of the defendant." [Citation.]' [Citation.] '"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citations.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]" [Citation.] A motion for a mistrial should be granted when ""a [defendant's] chances of receiving a fair trial have been irreparably damaged.""" [Citation.]' [Citation.]" (*Breceda, supra,* 76 Cal.App.5th at p. 89.)

"A trial court may grant a continuance in a criminal case only for good cause. (§ 1050, subd. (e).) '"The cases recognize that, as a general matter, a trial court 'has broad discretion to determine whether good cause exists to grant a continuance of the trial' [citation], and that, in reviewing a trial court's good-cause determination, an appellate court applies an 'abuse of discretion' standard." [Citation.] "[I]n making its good-cause determination, a trial court must consider all of the relevant circumstances of

93

the particular case, 'applying principles of common sense to the totality of circumstances . . . .'" [Citation.]' [Citation.] '""The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.'" [Citation.] In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction. [Citation.]" [Citations.]' [Citation.]" (*Breceda, supra,* 76 Cal.App.5th at pp. 90-91.)

### a. Witness Demeanor and Confrontation

Kocontes asserts the courtroom configuration interfered with the jurors' ability to assess witness demeanor and thus violated his right to present a defense and confront witnesses. Not so.

A witness's demeanor is relevant to credibility, part of the evidence, and "'of considerable legal consequence.'" (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358.) "The confrontation clause of the Sixth Amendment, applicable to the states through the [Fourteenth] Amendment, provides, 'In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . .' This right '"provides two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination."' [Citations.] [¶] Nonetheless, while 'face-to-face confrontation forms "the core of the values furthered by the Confrontation Clause" [citation] . . . , it is not the *sine qua non* of the confrontation right.' [Citations.] Rather, '"the Confrontation Clause reflects a *preference* for face-to-face confrontation at trial," [citation], a preference that "must occasionally give way to considerations of public policy and the necessities of a case."' [Citations.] The face-to-face requirement can be dispensed with, but 'only where denial of such confrontation is

94

necessary to further an important public policy and only where the reliability of the testimony is otherwise assured.' [Citations.] This public policy exception is not a general one; it must be applied on a case-by-case basis. [Citations.]" (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 35-36 (*Alvarez*).) Our review is de novo. (*Id.* at p. 36.)

"The 'ultimate goal' of the confrontation clause, ensuring the reliability of evidence [citation], 'is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by [subjecting it to] the crucible of cross-examination' and other procedural safeguards. [Citation.] Those procedural safeguards are: (1) in-person testimony; (2) given under oath; (3) subjected to cross-examination[;] and (4) the ability of the defendant and fact finder to view witness demeanor for the purpose of evaluating credibility. [Citation.] The 'combined effect' of these elements of confrontation 'ensur[es] that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings.' [Citation.]" (*Alvarez, supra,* 75 Cal.App.5th at p. 37.)

*Alvarez, supra,* 75 Cal.App.5th 28, is instructive. In that case, the court found compelling policy reasons for the mask requirement, stating "there is no doubt that requiring people to wear masks covering the mouth and the lower part of the nose while testifying in the courtroom during the COVID-19 pandemic served an important state interest in protecting the public from a contagious, and too often, lethal, disease." (*Id.* at p. 36.) While acknowledging a potential minor limitation on a jury's ability to assess witness demeanor, the court concluded that "all four safeguards inherent in confrontation were present." (*Id.* at p. 38; see *People v. Lopez* (2022) 75 Cal.App.5th 227, 235 [addressing mask requirement during COVID-19 pandemic and noting many unaffected factors relevant to assessing credibility as stated in CALCRIM No. 226].)

Although *Alvarez* concerned a mask requirement, its reasoning is persuasive here. The trial court did not violate Kocontes's confrontation right by socially

distancing the jurors in the courtroom because he was able to cross-examine all witnesses, face-to-face, and under oath with the jury able to assess their demeanor and credibility. Kocontes and the prosecution's rebuttal witnesses were physically present in the courtroom, and jurors were able to see their unmasked faces, observe their body language, hear their voices, and otherwise assess their demeanor. Similar to the mask requirement in *Alvarez*, the court's social distancing protocol furthered the important public policy of ensuring the health of everyone in the courtroom in the midst of a lethal pandemic. Kocontes cites to four instances where jurors could not see or hear the witness, but the trial court promptly addressed the issues without further complaint.

Additionally, the confrontation clause does not require jurors be seated a certain distance from a testifying witness.[29] (See *United States v. Petit* (S.D.N.Y. 2020) 496 F.Supp.3d 825, 828-829 [rejecting defendant's claim jurors sitting in gallery in back of the courtroom "'60 or more feet from a witness encased in a plexiglass cube'" violated confrontation clause].) As the United States Supreme Court opined in *Craig*, face-to-face confrontation is a preference not an absolute requirement and must occasionally yield to important public policy concerns. (*Craig, supra,* 497 U.S. at p. 849.) Ensuring the health of all courtroom users during the COVID-19 pandemic was an important public policy concern.

Finally, Kocontes was not deprived of his right to present a defense. The trial court's social distancing protocols did not deprive him of the ability to testify or present additional witnesses. In fact, three of his witnesses, Brentnell, McQueen, and Price, testified live via video at his request. Therefore, the courtroom configuration did not violate his right to confront witnesses or present a defense.

---

[29]　　We note that in ruling, the trial court suggested the farthest a juror sat from the witness was either 10 feet or 10 feet from juror No. 1 who was about 27 feet away from the witness stand. The court previously noted the farthest juror sat about 45 feet from the witness stand. Based on the court's detailed diagram and thorough discussion of the courtroom configuration, we think the court simply misspoke.

96

*b. Communication with Counsel*

Kocontes contends the courtroom configuration and mask requirement interfered with his ability to communicate with Gragg and thus denied him assistance of counsel. We disagree.

The Sixth Amendment right to counsel in a criminal case includes the defendant's right to communicate and consult with his attorney during trial. (*Perry v. Leeke* (1989) 488 U.S. 272, 284 [right to counsel not impaired by court order trial counsel not talk to client during a 15-minute recess in the middle of his testimony]; *Geders v. United States* (1976) 425 U.S. 80, 88-91 [right to counsel impaired by court order trial counsel not talk to client during overnight recess during his testimony].) However, "[n]ot every restriction on counsel's time or opportunity . . . to consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel." (*Morris v. Slappy* (1983) 461 U.S. 1, 11.)

*People v. Zammora* (1944) 66 Cal.App.2d 166 (*Zammora*), is instructive. In that "gang" case, 22 defendants were jointly tried for murder and other offenses. The trial court refused to permit defendants to sit with their counsel at the trial because of the large number of defendants and counsel and the lack of space in the courtroom. (*Id*. at pp. 227-234.) Defendants sat in the courtroom in a group some distance from counsel as to be unable to talk except by walking to their locations. (*Id*. at pp. 227, 234.) Additionally, the court ordered counsel not talk to defendants during court recesses. (*Id*. at p. 227.)

In reversing defendants' convictions, the *Zammora* court stated the following: "To us it seems extremely important that, during the progress of a trial, defendants shall have the opportunity of conveying information to their attorneys during the course of the examination of witnesses. The right to be represented by counsel at all stages of the proceedings, guaranteed by both the Federal and State Constitutions, includes the right of conference with the attorney, and such right to confer is at no time

97

more important than during the progress of the trial. . . . A basic part of a defendant's right to counsel is that of consultation whenever necessary. To afford to the defendant the benefits of the foregoing clause of the Constitution, it is essential that he should be allowed to consult with his counsel not only prior to the commencement of his trial, but during the actual progress thereof. . . . The Constitution primarily guarantees a defendant the right to present his case with the aid of counsel. That does not simply mean the right to have counsel present at the trial, but means that a defendant shall not be hindered or obstructed in having free consultation with his counsel, especially at the critical moment when his alleged guilt is being made the subject of inquiry by a jury sworn to pass thereon. At such time, in order that he may have absolute freedom to assist by suggestion and information in his own defense, the accused has the right to sit with his counsel, or at least to be so situated that he can freely and uninterruptedly communicate and consult with his attorney. It is the court's duty to provide adequate quarters and facilities, which the court has the power to do without limitation. [Citation.]" (*Zammora, supra,* 66 Cal.App.2d at pp. 234-235.)

Unlike in *Zammora*, the trial court did not entirely prohibit attorney-client consultation. Kocontes was not hindered or obstructed on having free consultation with Gragg. To protect everyone in the courtroom from a mysterious, contagious, and deadly virus, the court required Kocontes to be seated six feet from Gragg and to wear a mask. But he could lean over and talk and/or pass a written note to his counsel, and advise the court if he had any problems communicating with her. The trial court assured Gragg that she could consult freely with Kocontes whenever needed and confer confidentially at any time. This comports with *Zammora's* holding a defendant's right to counsel includes consultation whenever necessary. Although Gragg represented Kocontes was hearing impaired, Kocontes cites to no place in the record where his right to consult with counsel was hindered. To the contrary, the record indicates the communication between

98

Kocontes and his counsel was unimpeded. This record demonstrates Kocontes was not prejudiced by the seating configuration or the mask requirement.

While we agree generally defendants sit at the defense table to assist with their defense (*U.S. v. Correa-Osorio* (1st Cir. 2015) 784 F.3d 11, 20), several pre-pandemic federal cases demonstrate alternative seating arrangements did not hinder defendants' right to consult with counsel. (*U.S. v. Levenite* (4th Cir. 2002) 277 F.3d 454, 465 [right to consult with counsel not infringed where defendants sat about six feet behind counsel because they could freely communicate with counsel by leaning forward and speaking directly to counsel or passing notes]; *U.S. v. Balsam* (1st Cir. 2000) 203 F.3d 72, 82 [right to consult with counsel not infringed where defendants sat in front row of spectator section because defendants could freely communicate with counsel by passing notes or walking short distance to counsel table]; *U S. v. Jones* (6th Cir. 1985) 766 F.2d 994, 1004 [right to consult with counsel not infringed where defendants sat behind counsel because defendants permitted to pass notes to their attorneys, counsel could get up and discuss matters with their clients, and confer during recesses].) Additionally, one COVID-19 case concluded a similar seating arrangement to here did not infringe on defendant's right to consult with counsel because the court intended to allow defendant to consult freely during trial, pass notes, and confer during recesses. (*U.S. v. Crittenden* (M.D.Ga., Aug. 21, 2020, No. 4:20-CR-7 (CDL)) 2020 U.S.Dist. Lexis 151950.)

We find the reasoning in these cases persuasive. The court indicated Gragg could speak with Kocontes confidentiality at any time, and allowed them to confer several times during trial. The court did not prohibit them from passing notes or conferring during recesses. Nothing prevented Kocontes from quickly conferring with Gragg during the prosecution's rebuttal witnesses' testimony.

99

Kocontes compares the courtroom configuration to defendants who were shackled. Nonsense. Visible shackles prejudice a defendant. (*Deck v. Missouri* (2005) 544 U.S. 622, 628, 635.) Nothing about the courtroom configuration to protect courtroom users from the COVID-19 pandemic inherently prejudiced Kocontes. His reliance on cases involving interpreters is similarly misplaced. (*People v. Romero* (1984) 153 Cal.App.3d 757, 761 [defendant could "observe but not comprehend the criminal process"].) He cites to no place in the record where he had difficulty understanding the proceedings. In conclusion, the records demonstrates the trial court permitted Kocontes to freely communicate with Gragg and his right to assistance of counsel was not infringed.

*c. Right to Public Trial*

Kocontes argues the trial court denied him his constitutional right to a public trial. It didn't.

The United States Constitution and the California Constitution guarantee a criminal defendant the right to a public trial. (U.S. Const., 6th & 14th amends.; Cal. Const., art. I, § 15; *Presley v. Georgia* (2010) 558 U.S. 209, 210, 214-215; *People v. Woodward* (1992) 4 Cal.4th 376, 381 (*Woodward*) [state constitutional right to public trial coextensive with federal guarantee].) """"The requirement of a public trial is for the benefit of the accused; that the public may see he is fairly dealt with and not unjustly condemned, and that the presence of interested spectators may keep his triers keenly alive to a sense of their responsibility and to the importance of their functions . . . ."" [Citations.]" (*Waller, supra,* 467 U.S. at p. 46.) "'The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.'" (*Id.* at p. 45.)

100

In *Waller,* the Court identified four requirements necessary to justify exclusion: (1) the existence of an "overriding interest that is likely to be prejudiced" absent the closure; (2) the closure is narrowly tailored, i.e., "no broader than necessary to protect that interest"; (3) no reasonable alternatives to closing the proceeding are available; and (4) the trial court must "make findings adequate to support the closure." (*Waller, supra,* 467 U.S. at p. 48; *Woodward, supra,* 4 Cal.4th at p. 383.) Exclusion of the public from a criminal trial will be rare based on a trial court's careful balancing of case specific competing interests. (*Waller, supra,* 467 U.S. at p. 45.)

Courts have drawn a distinction between complete closures and partial closures. (*Woodward, supra,* 4 Cal.4th at p. 384 [concluding *Waller* and its progeny were inapposite in a partial closure case]; *People v. Baldwin* (2006) 142 Cal.App.4th 1416, 1421, fn. 1; *U.S. v. Sherlock* (9th. Cir. 1989) 962 F.2d 1349, 1357.) Kocontes does not recognize this distinction.

In *Woodward, supra,* 4 Cal.4th at page 380, the trial court directed the courtroom doors be closed and locked during closing argument, and a sign placed on the courtroom door reading: "'Trial in progress—Please do not enter . . . .'" Gragg observed the sign and moved for a mistrial. (*Ibid.*) The trial court denied the motion, explaining the bailiff had done so to prevent interruptions and for security purposes. (*Ibid.*) The court agreed to take the sign down and unlock the courtroom doors. (*Ibid.*) The court added that during the time in question there were people in the audience in the courtroom and people were not prevented from entering the courtroom and observing proceedings. (*Ibid.*)

Our Supreme Court held "the closure of the courtroom doors to additional spectators during part of the prosecutor's arguments, being both temporary in duration and motivated by legitimate concerns to maintain security and prevent continuous interruptions of closing arguments, and not involving the exclusion of preexisting spectators, did not constitute a denial of defendant's public trial right." (*Woodward,*

*supra,* 4 Cal.4th at p. 381.)  The court noted "the courtroom was never cleared to remove all spectators for a significant period." (*Id.* at p. 385.)  Additionally, the trial court had "expressed substantial reasons justifying the temporary closure, namely, to maintain court security and orderly courtroom proceedings." (*Ibid.*)  The court held "the de minimis rationale . . . is more pertinent to the circumstances in this case, in which the closure did not exclude preexisting spectators, did not include any of the evidentiary phase of the trial and lasted only one and one-half hours." (*Id.* at pp. 385-386.)  Accordingly, the court held that "defendant had a public trial throughout the entire proceeding." (*Id.* at p. 385.)

*Woodward* stands for the proposition *Waller* is applicable only where "the general public was entirely or substantially excluded from trial or pretrial proceedings." (*Woodward, supra,* 4 Cal.4th at p. 384.)  That did not occur here.  Beginning on May 26, the number of seats available to the public was decreased to comply with CDC social distancing guidelines.  The record includes no evidence that beginning on that day and until the end of trial, any member of the public was prevented from entering the courtroom.  Kanesaki's brother and his wife observed proceedings, and no member of Kocontes's family was there to watch.  Like in *Woodward*, the courtroom was never cleared.  Kocontes complains that after initially indicating there was one seat available to the public, the trial court indicated it miscalculated and there were actually eight seats available to the public.  He wonders where the additional nine seats came from.  Gragg did not dispute the court's revised calculation, and Kocontes cannot challenge it now. (See *People v. Gibson* (1994) 27 Cal.App.4th 1466, 1468 [factual error forfeited because it could have been corrected in trial court].)

The record establishes there were eight seats available to the public.  Based on the trial court's description of the courtroom seating, there were typically 140 seats available to the public.  In a high profile case such as this one, had there been more than 115 people who wanted to observe the case and people were turned away, would that

102

amount to a denial of a public trial? Based on Kocontes's rationale, the constitutional right to a public trial would be implicated anytime someone could not overserve a trial because courtroom capacity was met. How many available seats does a public trial require? Kocontes cites to no authority, and we found none, that holds decreasing the number of available public seats amounts to a constitutional closure. There is no evidence any member of the public was turned away so it appears the public seating was adequate.

Assuming for the sake of argument *Waller* applies, the sum total of Kocontes's argument is as follows: "The only interest that was served was the court's insistence on pressing ahead with the trial instead of continuing it or granting a mistrial. Both a mistrial and a continuance would be 'reasonable alternatives' to excluding the public in a case of this magnitude." Because he does not provide reasoned argument on each of *Waller's* elements, he forfeits this claim. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 363.)

Assuming the claim is preserved, the *Waller* test was satisfied here. First, decreasing the number of seats available to protect the health of courtroom users during the COVID-19 pandemic was an overriding interest. Second, the courtroom reconfiguration was narrowly tailored. After ensuring counsel, Kanesaki's family, Kocontes, and jurors were accounted for and represented, the court ensured everyone was sitting six feet or more apart based on a seating arrangement it had previously tested. The court stated it would consider allowing others to be present in the courtroom. Moreover, the court ruled the proceedings could be livestreamed. The record, of course, is silent on this but it is reasonable to infer livestreaming increased the nature of the public trial. The trial occurred here in May 2020, at the onset of the COVID-19 pandemic when many people were sheltering in their homes.

Third, the record demonstrates there were no reasonable alternatives without elevating the risk to the health of courtroom users. The trial court went to great

103

pains to develop a seating arrangement that both protected the health of courtroom users and Kocontes's right to a public trial.  Finally, the trial court made specific findings adequate to justify any partial closure.  Protecting the health of courtroom users from COVID-19 unquestionably constituted a "'higher value'" that the trial court relied upon to limit the number of people inside the courtroom.  (*Waller, supra,* 467 U.S. at p. 45.)

Based on this record, we join other courts from across the United States that have concluded COVID-19 protocols did not violate a defendant's right to a public trial.  (*U.S. v. Babichenko* (D. Idaho 2020) 508 F.Supp.3d 774, 777-781; *Lappin v. State* (Ind.Ct.App. 2021) 171 N.E.3d 702, 707; *Vazquez Diaz v. Commonwealth* (2021) 487 Mass. 336 [167 N.E.3d 822, 839].)  Contrary to Kocontes's claim, the courtroom was not effectively closed to the public, and his constitutional right to a public trial was not violated.

*d.  Right to a Fair Trial and Due Process*

Kocontes asserts the trial court erred by denying his mistrial and continuance motions because of the delay and the uneven playing field.  We quickly dispose of his first claim before addressing his second.

In *Breceda, supra,* 76 Cal.App.5th at pages 95 and 100, another panel of this court rejected defendant's claim a 73-day delay violated his due process right to fair trial.  In so doing, the court relied in large part on the trial court's admonitions before and after the pause in proceedings.  (*Id*. at p. 100.)  The same is true here as to both the length of the day and the admonitions.  As in *Breceda*, here the court ensured the jury could afford Kocontes, and the prosecution, a fair trial.  We also explained how the cases defendant relied on there, the same cases Kocontes relies on, were distinguishable.  (*Id*. at p. 93, citing *People v. Santamaria* (1991) 229 Cal.App.3d 269, 277; *U.S. v. Hay* (9th Cir. 1997) 122 F.3d 1233, 1235-1236.)

Here, on March 16, both Gragg and Kocontes agreed pausing proceedings was preferable to continuing.  Kocontes cannot now complain the pause he agreed to was

error.  (See *People v. Powell* (2018) 6 Cal.5th 136, 145 [forfeited and invited error when counsel approved procedure for dual juries].)  When trial resumed on May 26, Gragg moved for a mistrial or alternatively a continuance.  The request for a continuance was in direct contravention of her argument the delay causes jurors memories to fade.  Because it was uncertain when things would return to normal,[30] the court did not abuse its discretion by implicitly denying a continuance.

Kocontes's second contention is the more novel one.  The due process clauses of the United States and California Constitutions protect individuals from the deprivation of life, liberty, or property without due process of law.  (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7.)  "As applied to a criminal trial, denial of due process is the failure to observe that fundamental fairness essential to the very concept of justice.  In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial."  (*Lisenba v. California* (1941) 314 U.S. 219, 236.)

"'"The essence of due process is the requirement that 'a person in jeopardy of serious loss [be given] notice of the case against him and opportunity to meet it.'" [Citations.]  The opportunity to be heard must be afforded "at a meaningful time and in a meaningful manner."  [Citations.]  To ensure that the opportunity is meaningful, the United States Supreme Court and [the California Supreme Court] have identified some aspects of due process as irreducible minimums. . . .'  [Citation.]  In other words, 'Due process . . . *always* requires a relatively level playing field, the "constitutional floor" of a "fair trial in a fair tribunal," [is] a fair hearing before a neutral or unbiased decision-maker.'  [Citation.]"  (*California DUI Lawyers Assn. v. Department of Motor Vehicles* (2018) 20 Cal.App.5th 1247, 1259.)

---

[30]  Over two years later, things still haven't returned to normal.

Due process does not require absolute symmetry between rights granted to the prosecution and those afforded the defense. Our system is not one of symmetry at every stage, but of an overall balance designed to achieve the goal of a fair trial. (*Tyson v. Trigg* (7th Cir. 1995) 50 F.3d 436, 440-441.) Nevertheless, a shift at just one stage of a criminal trial as to the rights or advantages granted to each side might so skew the balance of rights or advantages in favor of the prosecution that it deprives the defendant of the right to a fair trial. (*Id*. at p. 441.)

Although the COVID-19 pandemic caused a shift during Kocontes's presentation of his defense, the shift did not so skew the balance of rights or advantages in favor of the prosecution that it resulted in an unfair trial for Kocontes. The unprecedented global health crisis required the trial court to balance Kocontes's constitutional rights, the jurors' health, and preserving judicial resources. Judicial officers at all levels undergo extensive training beginning shortly after they are sworn in. But no training prepared this court, and courts across the United States, with the unique challenges COVID-19 presented. The record reflects the court remained appropriately focused on these compelling interests.

When trial resumed on May 26, the CDC's guidelines resulted in jurors being seated throughout the courtroom from 10 to 45 feet from the witness. It also required courtroom users had to wear masks. But the testifying witness and attorney who questioned the witness did not have to wear a mask. The court implemented these health protocols after the prosecution's case-in-chief and after three defense witnesses had testified—the next witness to testify was Kocontes. We cannot say these health protocols so skewed the balance of rights or advantages in favor of the prosecution. Yes, as Kocontes testified jurors sat farther away than they sat from the prosecution's witnesses. The record reveals there were four instances where a juror said she/he could not hear or see. But the trial court immediately addressed those issues. And jurors sat the same distance away from Kocontes when the prosecutor cross-examined him and when the

106

prosecution presented its rebuttal witnesses. Additionally, Gragg cross-examined the prosecution's witness before the pause in proceedings without the health protocols in place.

As we explain above, Kocontes sat six feet away from Gragg but the record indicates they conferred. And Kocontes cites to no place in the record where they were unable to communicate. The COVID-19 pandemic meant Kocontes's presentation of his case was to some extent asymmetrical to the prosecution's case, vis-à-vis, the courtroom configuration. But the trial court's thoughtful and well-designed reconfiguration resulted in an overall balanced grant of rights and advantages to the prosecution and Kocontes. Thus, the trial court did not err by denying Kocontes's mistrial motion or implicitly his motion for a continuance. His federal constitutional rights were not violated.

*F. Postverdict* Marsden *Motion*

*1. Background*

During trial, Kocontes made four motions to relieve his appointed counsel pursuant to *Marsden, supra,* 2 Cal.3d 118. The trial court conducted hearings and denied the motions.

The jury returned its verdicts on June 15. Gragg requested the trial court delay sentencing to prepare a motion for new trial. The court concluded there was good cause to delay sentencing and set sentencing for September 18.

On September 8, Kocontes's court-appointed investigator on the solicitation case notified the trial court Kocontes requested a fifth *Marsden* hearing on September 11.

At the hearing on September 11, Kocontes filed a *Marsden* motion. In his motion, Kocontes requested substitution of appointed counsel to bring a motion for new trial based on ineffective assistance of counsel (IAC). He claimed Gragg failed to offer the following evidence and do the following: (1) A witness would testify Price assaulted Kocontes because of an investment; (2) A witness would testify Price conned the witness

107

similar to how he conned Kocontes; (3) The cruise line's Italian liaison would corroborate his story; (4) An expert witness would testify Kanesaki's injuries were inflicted by two assailants; (5) A doctor would corroborate he had sleep issues and took prescription medication before and after the cruise; (6) A therapist would testify concerning Kanesaki's mental state; (7) His second interview with Stokes was necessary to explain his first interview; and (8) Gragg failed to give him documents necessary to assist him with preparing his *Marsden* motion and/or habeas corpus.

At the hearing, Gragg stated she had a conflict because Kocontes's new trial motion alleged IAC. Citing to *People v. Smith* (1993) 6 Cal.4th 684, the trial court explained the postverdict presentence standard for appointing new counsel was the same and it needed to know the nature of the conflict. Gragg repeated she had a conflict and said it was unfair to address his IAC claims without new representation. The court's tentative was to proceed and continued the matter to September 16.

On that day, Kocontes filed a supplement to his *Marsden* motion. He asserted the following two reasons Gragg was ineffective: (1) Werksman would testify Price was Kocontes's investigator; and (2) Bustamante would testify Price perjured himself before Judge Evans when he testified Bustamante and Michael threatened him if he testified.

At the hearing, the trial court indicated it would proceed on the *Marsden* motion and it may question Gragg but she was not required to respond. Gragg stated her concern she had a conflict was "heightened." After the court noted the issue was unique because Kocontes was an attorney asserting factual and legal issues, it stated the following: "Because what is before me, although [he] has filed it under . . . *Marsden*— what truly is before me . . . is a request . . . to appoint substitute counsel and to discharge you." Gragg said she had a conflict and Kocontes had a right to have new counsel review his IAC claims. The court repeated it was not asking Gragg to justify her tactical decisions.

As to the merits of the motion, the trial court explained it had reviewed its notes of the prior four *Marsden* hearings. With the court's permission, Kocontes claimed in court that Gragg also failed to offer the following evidence and do the following: (1) Kocontes and Price's e-mails that corroborated Price and McQueen planned to go on the cruise; (2) Kocontes and Saranita's telephone calls where Saranita corroborated Kanesaki's alcohol abuse; (3) state grand jury testimony from Price, Ricci, Nguyen, and Brentnell demonstrating false statements; (4) rely on the court's August 9, 2017, order at trial when arguing the solicitation evidence was inadmissible; and (5) communications between Stokes and his former attorney. Kocontes asserted the trial court could not evaluate the significance of evidence not presented at trial. The court indicated it did not need to question Gragg and was ready to rule.

The trial court reasoned *Marsden* principles and a new trial motion based on IAC "somewhat merge in this case." Based on the previous *Marsden* motions and what occurred at trial, the court denied Kocontes's *Marsden* motion. The court recited each of the approximately 13 items that Kocontes asserted demonstrated Gragg's performance was deficient and indicated it analyzed each category. The court opined Gragg's performance was not below the standard of care, and assuming it was, the result would not have been different. The court described the evidence of Kocontes's guilt as "overwhelming" and noted the jurors deliberated for one hour. Kocontes represented his former attorney on this matter, David Michael, was willing to represent him. The court noted it could not consider that request without the prosecutor present.

The following day, Gragg filed a motion for new trial. Kocontes alleged the following: (1) jurisdiction; (2) *Massiah*; (3) White's e-mails; and (4) the COVID-19 health protocols denied him a fair trial.

At the sentencing hearing the next day, the trial court explained it had denied the *Marsden* motion and read and consider the new trial motion. Gragg stated Kocontes withdrew his request to have Michael represent him but he requested to

109

represent himself and sought a continuance to supplement the new trial motion. The court indicated its tentative ruling was to deny the request because it set the sentencing date when the jury returned its verdict and the structural right to represent oneself is not absolute. The court explained it had to consider whether granting the motion would disrupt the orderly administration of justice and the impact on the victim's family, two of whom were at the hearing, under Marsy's Law (Cal. Const. art. 1, § 28). The court denied Kocontes's request to represent himself. As to the new trial motion, the court heard counsel's argument and denied the motion before sentencing him.

2. *Law and Analysis*

a. Marsden *Motion*

Kocontes argues the trial court erred by failing to appoint substitute counsel to investigate and litigate his postverdict *Marsden* claim. We disagree.

A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*); *People v. Williams* (2013) 56 Cal.4th 630, 690 (*Williams*).) To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland, supra,* 466 U.S. at pp. 687-689 [strong presumption counsel's conduct reasonable and judicial scrutiny highly deferential]; *Williams, supra,* 56 Cal.4th at p. 690 [same].) To demonstrate prejudice, a defendant asserting an ineffective assistance claim on appeal must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (*Strickland, supra,* 466 U.S. at pp. 693-694 [probability sufficient to undermine confidence in outcome]; *Williams, supra,* 56 Cal.4th at p. 690 [same].)

"Criminal defendants are entitled to competent representation. If a defendant cannot afford to hire an attorney, one must be appointed for the defendant." (*People v. Smith* (1993) 6 Cal.4th 684, 690 (*Smith*).) *Marsden, supra,* 2 Cal.3d 118, is the seminal case concerning appointment of substitute counsel.

In *Marsden*, our Supreme Court reasoned "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (*Marsden, supra,* 2 Cal.3d at p. 123.) The trial court must give the defendant the opportunity to explain the reasons for desiring a new attorney. (*Id.* at pp. 123-125 [trial court cannot carefully exercise discretion without hearing defendant's reasons for requesting substitution of counsel].)

In *Smith*, our Supreme Court explained that "substitute counsel should be appointed when, and only when, necessary under the *Marsden* standard, that is whenever, in the exercise of its discretion, the court finds that the defendant has shown that a failure to replace the appointed attorney would substantially impair the right to assistance of counsel [citation], or, stated slightly differently, if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*Smith, supra,* 6 Cal.4th at pp. 693, 696 [applies posttrial and postconviction].)

Of particular importance here, the *Smith* court held that "'[w]hen, after trial, a defendant asks the trial court to appoint new counsel to prepare and present a motion for new trial on the ground of ineffective assistance of counsel, the court must conduct a hearing to explore the reasons underlying the request.'" (*Smith, supra,* 6 Cal.4th at p. 692.) The court explained, "'If the claim of inadequacy relates to courtroom events that the trial court observed, the court will generally be able to resolve the new trial motion without appointing new counsel for the defendant. [Citation.] If, on the other

111

hand, the defendant's claim of inadequacy relates to matters that occurred outside the courtroom, and the defendant makes a "colorable claim" of inadequacy of counsel, then the trial court may, in its discretion, appoint new counsel to assist the defendant in moving for a new trial. [Citations.]' [Citation.]" (*Id*. at pp. 692-693.) A colorable claim is established "if the record shows that the first appointed attorney is not providing adequate representation or that the defendant and the attorney have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result [citation]." (*Id*. at p. 696.)

Here, the trial court did not abuse its discretion by denying Kocontes's postverdict *Marsden* motion. The trial judge who presided over this *Marsden* motion was the same judge who presided over Kocontes's prior four *Marsden* motions. Thus, the judge was intimately familiar with the arguments and trial record and was uniquely qualified to rule on the postverdict *Marsden* motion. As to the postverdict motion, the court conducted a thorough hearing over two days where it heard from Gragg and Kocontes. The court read and considered Kocontes's written motion and supplemental motion. Additionally, the court permitted Kocontes to supplement his written submissions orally at the second day of the hearing. Unlike in *People v. Reed* (2010) 183 Cal.App.4th 1137, 1144-1145, here the court afforded Kocontes the time to make his case for a new trial.

When Kocontes concluded, the trial court addressed each alleged incident of IAC. The court thoroughly explained that based on its prior *Marsden* rulings and the trial record, Gragg's representation was not below the standard of care, but if it was, it was not reasonably probable Kocontes would have received a better result because the evidence of his guilt was overwhelming. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1113 [trial court uniquely situated to evaluate defendant's renewed IAC claims based on previous extensive inquiries and observations of counsel's performance throughout entire trial].)

112

Kocontes argues the trial court did not conduct a sufficient inquiry into the IAC claims and erroneously failed to question Gragg. Of the approximately 15 alleged incidents of IAC, he cites to three. As to matters within the record, he asserts the court did not sufficiently inquire into Gragg's performance concerning the following: (1) Nguyen's testimony that before the cruise Kocontes threatened to kill Kanesaki; and (2) the 2014 solicitation evidence. First, the trial court was well acquainted with this evidence and it was not required to appoint substitute counsel to evaluate these claims. Contrary to Kocontes's claim, Gragg thoroughly cross-examined Nguyen concerning her conflicting testimony concerning this statement. She highlighted the inconsistencies in her opening statement and closing argument. Second, Gragg zealously contested admission of the solicitation evidence. She requested the trial court prohibit the prosecution from cross-examining Kocontes about the solicitation evidence and requested a *Massiah* hearing because the court did not expressly rule on that issue in 2017.

With respect to matters "outside the record," Kocontes asserts the trial court did not sufficiently inquire into Gragg's performance regarding "impeaching material" on his computer. At the hearing, Kocontes supplemented his written motions and asserted there were e-mails on his computer establishing the following: (1) Price knew about and intended to go on the cruise and advised Kocontes to purchase travel insurance; and (2) he left Italy because a consulate official said Kanesaki's body would not be found.

Although e-mails on his computer were technically outside of the record, this evidence was not new to the trial court. Gragg thoroughly cross-examined Price about whether he knew of and planned to go on the cruise with Kocontes. And before Kocontes testified, Gragg elicited answers from Price demonstrating Kocontes was frustrated with Italian authorities because of the language barrier and they told him it was unlikely they would recover Kanesaki's body. Price confirmed he told Kocontes to return to the United States. Like the other matters in the record, the trial court was aware of these and was able to assess Gragg's performance and its impact within the entire

113

record without appointing substitute counsel for the defendant.  Because Kocontes did not make the required showing, the trial court did not need to question Gragg.

Kocontes argues that solely by virtue of Gragg declaring she had a conflict, he was unrepresented when the trial court considered his *Marsden* motion.  This is not fatal.  "A trial court is not required to appoint separate counsel to press a *Marsden* claim for a defendant . . . ."  (*People v. Clark* (2011) 52 Cal.4th 856, 917.)  Here, the trial court made a sufficient inquiry, heard from Kocontes at length, and exercised its discretion within the bounds of reason.  That was all that was required.  Assuming for the sake of argument the trial court appointed substitute counsel, we are certain the court would have decided similarly.  Kocontes's allegations were exhaustive, and the trial court's reasoning was thorough.  Kocontes is not without a remedy.  (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 [IAC contentions more appropriately decided in habeas corpus].)  He can file a habeas corpus petition and allege Gragg was ineffective, which Kocontes states he intends to do.

b.  *Self-representation Motion*

Citing to *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*), Kocontes contends the trial court erred by denying his motion to represent himself at the sentencing hearing to file a new trial motion alleging IAC.  Not so.

"The United States Supreme Court has made clear that a criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses.  [Citation.]  A trial court must grant a defendant's request for self-representation if the request is made within a reasonable time prior to the commencement of trial, is unequivocal, and is made voluntarily, knowingly, and intelligently.  [Citation.]  If a self-representation motion is untimely, it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*.'  [Citation.]"  (*People v. Wright* (2021) 12 Cal.5th 419, 435-436 (*Wright*).)  "[W]hen a defendant requests to represent himself in the middle of trial, the court must inquire into

114

the specific factors underlying the request. [Citation.] Additionally, 'other factors to be considered by the court in assessing such requests made after the commencement of trial are the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion.' [Citation.]" (*Id*. at p. 439.)

The purpose of the timeliness requirement is to prevent a defendant from misusing a *Faretta* motion to unjustifiably obstruct the orderly administration of justice or delay trial. (*People v. Lynch* (2010) 50 Cal.4th 693, 722 (*Lynch*), disapproved on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 637, 643.) A trial court must not use the timeliness requirement to limit a defendant's constitutional right to self-representation. (*Lynch, supra,* 50 Cal.4th at p. 722.) In determining timeliness, the sentencing hearing is considered "a proceeding separate and distinct from the trial." (*People v. Miller* (2007) 153 Cal.App.4th 1015, 1024 (*Miller*).)

The *Wright* court acknowledged our Supreme Court has declined to articulate what standard a reviewing court applies when determining timeliness but concluded in that case it was untimely under both de novo and abuse of discretion standards. (*Wright, supra,* 12 Cal.5th at p. 437.) As do we. Two cases are instructive, neither of which Kocontes discusses.

In *Miller*, the court concluded defendant's motion for self-representation made two months before the sentencing hearing was timely. (*Miller, supra,* 153 Cal.App.4th at p. 1024.) However, the court opined, "[m]uch as a request to represent oneself at trial must be made a reasonable time before trial commences, the request for self-representation at sentencing must be made within a reasonable time prior to commencement of the sentencing hearing." (*Ibid*.)

In *Doolin, supra,* 45 Cal.4th at page 454, our Supreme Court held a request for self-representation made on the date of sentencing was "manifestly untimely." In so

115

holding, the court noted defendant "never requested self-representation during the guilt or penalty phase"; "[h]e appeared on the day set for sentencing and sought, not to act as his own counsel, but to replace his appointed lawyer with a new one and to secure a continuance"; and "[o]nly when this approach failed did [the] defendant seek self-representation, and only then with the appointment of an assistant to actually draft his moving papers." (*Ibid.*)

Here, this case is more like *Doolin*. Kocontes requested to represent himself because he wanted a continuance to supplement his new trial motion alleging IAC. But as we explain above, Kocontes asserted 15[31] alleged incidents of IAC. Unlike in *People v. Braxton* (2004) 34 Cal.4th 798, 819, here the trial court did not refuse to hear his new trial motion. The court considered and rejected all the IAC claims, opining Gragg's performance did not fall below the standard of care.

Kocontes had a proclivity to try to substitute counsel, filing five *Marsden* motions, including one about a week before sentencing. Unlike in *Miller*, Kocontes sought to represent himself not two months before sentencing but like in *Doolin* on the day the court was set to impose punishment. And similar to *Doolin*, it does not appear from this record Kocontes requested to represent himself at any point during this trial.

Kocontes requested a continuance but he did not specify how long he needed. Based on Kocontes's litigious history, we can only assume any delay would have been significant had the trial court granted the motion. Consistent with *Lynch*, the court here concluded Kocontes's request to represent himself would unjustifiably obstruct the orderly administration of justice. The prosecution was ready for sentencing, and Kanesaki's brother and his wife were in the courtroom.

---

[31] Kocontes notes that at the *Marsden* hearing, he asserted "several" grounds of IAC. This is an understatement.

Kocontes's request to represent himself to further supplement his IAC claims was tethered to his postverdict *Marsden* motion. But he was laying the groundwork for his IAC claims well before that, as early as the hearing on his second *Marsden* motion on June 3, 2020. Waiting until the eve of sentencing to litigate a *Marsden* motion based entirely on IAC claims obstructed the orderly administration of justice.

Finally, none of the cases Kocontes cites to involve self-representation requests on the eve of sentencing. (*People v. Ortiz* (1990) 51 Cal.3d 975, 987 [request to discharge retained counsel after mistrial well before second trial]; *People v. Courts* (1985) 37 Cal.3d 784, 791 [request to substitute counsel before trial]; *People v. Lara* (2001) 86 Cal.App.4th 139, 156 [request to discharge retained counsel on day set for trial].) Thus, the trial court properly denied Kocontes's request to represent himself at the sentencing hearing.

*c. New Trial Motion*

Relying on section 1202, Kocontes claims the trial court "circumvented its statutory duty to hear a new trial motion." His claim is belied by the record.

In pertinent part, section 1202 states, "If the court shall refuse to hear a defendant's motion for a new trial or when made shall neglect to determine such motion before pronouncing judgment or the making of an order granting probation, then the defendant shall be entitled to a new trial." Kocontes is neither entitled to a new trial nor a conditional remand for the trial court to consider a new trial motion. Why? Because the trial court heard, considered, and denied his new trial motion based on IAC. Between his written *Marsden* motion, his written supplement to that motion, and his oral motion further supplementing his written motions, Kocontes alleged approximately 15 incidences of alleged IAC. The court analyzed and addressed each of those alleged incidences at the *Marsden* hearing. The court did not refuse to hear or neglect to determine Kocontes's

117

new trial motion. Contrary to Kocontes's claim, the court did not engage in a "double-play" that denied him his statutory right to litigate a new trial motion.

## G. *Harmless Error*

Above, we have concluded the trial court committed three evidentiary errors. We review evidentiary errors under the harmless error standard articulated in *People* v. *Watson* (1956) 46 Cal.2d 818, 836. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1308.) We ask whether it was reasonably probable the error affected the outcome of the case. (*Ibid*.) Based on the record before us, we would also conclude any error was harmless even under the more stringent beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18. "Applying that test, we ask 'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' [Citations.] In making that determination, we examine the entire record. [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 615 [*Chapman* standard applies to federal constitutional errors].) The evidence Kocontes murdered Kanesaki for financial gain was compelling.

The starting point for our harmless error analysis is there was overwhelming evidence Kanesaki's death was a homicide. Ricci, an expert pathologist who had performed thousands of autopsies, concluded Kanesaki had been hit on the head with a hard object and then strangled to death. Ricci explained Kanesaki's injuries to her neck were the result of powerful and prolonged compressive action. He added she did not drown and was not raped. The county's chief forensic pathologist agreed with Ricci that Kanesaki was strangled and did not drown or sustain her injuries from an accidental fall. Even Kocontes's expert witness testified Kanesaki was dead before she hit the water. She opined Kanesaki's injuries suggested there was a more reasonable cause of death than strangulation but her theory bordered on the implausible—(1) she fell from one deck to another and (2) fell into the water or someone threw her into the water. To believe her theory, one would have to ignore the severe hemorrhaging to Kanesaki's

neck. Kocontes's expert described the hemorrhaging to Kanesaki's neck as "really exceptional for a postulated strangulation case" that would have been caused by a "significant amount of physical force."

About eight months before the cruise, Kocontes told Nguyen the only way to get rid of Kanesaki was "'[t]o make her silent forever.'" Testimony from Price, Kocontes's longtime friend, demonstrated Kocontes was obsessed with sex and money. There was evidence Kanesaki was not satisfying the first obsession and interfering with the second. Kocontes himself testified they had a tumultuous relationship void of sexual intimacy. The evidence demonstrated Kocontes and Kanesaki argued about finances, which Kocontes confirmed. He stated they disagreed about what to do with their house. This was corroborated by Saranita who said Kanesaki wanted to keep the house and Kocontes wanted to sell it. This was further corroborated by Nguyen, who testified Kocontes was frustrated with Kanesaki because she did not want to sell the house and he needed to get it from her.

There was evidence that about one month before the cruise, Kocontes told Nguyen that he and Price planned to have Price's "people" throw Kanesaki in the water, and Price and McQueen would be his alibi. Later, Kocontes told Nguyen that Price and McQueen were not going on the cruise and he would have to take matters into his own hands.

The evidence demonstrated Kocontes selected a cruise ship that would best conceal his criminal activity. He spoke to Price about security on cruise ships and the lack of security cameras. Kocontes chose a low-budget cruise ship that was not state of the art. The Island Escape was a car ferry that had been converted into a cruise ship. Kocontes booked a room with a balcony.

The following evidence supports the conclusion Kocontes threw Kanesaki overboard from her own room's balcony. The ship's captain detailed the limited access guests had to the outside. The balcony rooms of course had outside access, but there was

119

no other outside access on that deck. Access to the railings on the remainder of the ship was severely limited. The decks that did have outside access did not have access to the railing; there was another deck below. Kocontes stated Kanesaki went to get tea. The only place to get tea after midnight was the Beachcomber, one deck above Kocontes's and Kanesaki's cabin. But Dodds testified that below the Beachcomber were more balconies, where one would land if they fell from the Beachcomber deck. Neither cruise ship security personnel nor security cameras detected Kanesaki the night she disappeared. Based on Kocontes's conversations with Price about cruise ship security, and the antiquated Island Escape, the jury could reasonably infer Kocontes purposefully chose the ship to enhance the likelihood his criminal conduct would go undetected. The more likely scenario was Kocontes knocked Kanesaki out, strangled her, and threw her over their cabin balcony.

The day after the woman Kocontes claimed he loved and was reuniting with went missing, he fled Italy and returned home without notifying Italian authorities. This demonstrated a consciousness of guilt. Kocontes testified at length about Kanesaki's family, including investments they made with Toshitaka. Yet Kocontes did not immediately call Toshitaka to tell him his sister was missing. Toshitaka learned Kanesaki died from the State Department.

It was a battle of the experts concerning how much Kocontes benefited financially from Kanesaki's death. Kocontes does not dispute Kanesaki was entitled to 50 percent of the proceeds of the sale of their house. Eight months after she died, that would have entitled her to $318,208.

After the cruise, the evidence established Kocontes scripted what Nguyen said to his attorneys and the federal grand jury. She initially refused to speak with federal law enforcement and got Kocontes's permission before speaking with Price and McQueen. This evidence tends to establish Kocontes hoped to carefully control what

120

Nguyen revealed to authorities. Based on this record, we conclude the three evidentiary errors were harmless beyond any reasonable doubt.

*H. Cumulative Error*

Kocontes argues the cumulative effect of the errors prejudiced him. He cites to the following errors: (1) The court erred by admitting evidence the 1999 incident involved "inappropriate relationship with a female"; (2) The court erred by denying his mistrial motion when Price insinuated the 1999 incident involved a minor and Kocontes knew bad actors from when he was incarcerated; (3) The court erred by admitting evidence Kanesaki's blood and urine testified negative for alcohol; (4) The court erred by admitting Kanesaki's March 2, 2005, e-mail(s) to White; (5) The court erred by admitting the solicitation evidence; and (6) The court erred by denying his mistrial motion because the COVID-19 health protocols infringed on his due process right to a fair trial.

As we explain above, we agree with Kocontes's first, third, and fourth claims. The trial court committed three evidentiary errors.

Our Supreme Court has explained cumulative prejudice in terms of the standard for reversible error: "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. [Citations.] Nevertheless, a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844 (*Hill*), overruled on another ground in *Price, supra,* 25 Cal.4th at p. 1069, fn. 13.) Cumulative error thus depends on any number of errors whose aggregate prejudicial effect must be considered in deciding whether the defendant's "guilt or innocence was fairly adjudicated." (*Hill, supra,* 17 Cal.4th at p. 844.) "The 'litmus test' for cumulative error 'is whether defendant received due process and a fair trial.' [Citation.]" (*People v. Cuccia* (2002) 97 Cal.App.4th 785, 795.)

For example, in *Hill* our Supreme Court held pervasive prosecutorial misconduct, along with instructional and other errors, required reversal. (*Hill, supra,*

121

17 Cal.4th at pp. 844-848.)  However, our Supreme Court has found that even when there were evidentiary and/or instructional errors, there was no cumulative prejudicial error when there was ample evidence of the defendants' guilt.  (*Brooks, supra,* 3 Cal.5th at p. 82; *Seumanu, supra,* 61 Cal.4th at p. 1317; *Clark, supra,* 52 Cal.4th at p. 1008.)

Although we concluded there were three evidentiary errors, those errors were harmless.  This was not a close case.  As we explain above, the evidence Kocontes killed Kanesaki for financial gain was overwhelming.  Evidence the 1999 incident involved an "inappropriate relationship with a female," Kanesaki's negative blood test, and her e-mails to White were not the damning evidence Kocontes portrays them to be.  The damning evidence was Kocontes's greed, his incriminating statements to Nguyen, his selection of a converted car ferry with non-existent security systems, and most importantly Kanesaki's extensive injuries to her head and neck.  We are not persuaded, therefore, the errors, whether considered individually or cumulatively, led to an unfair trial or a miscarriage of justice.

## DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

MOTOIKE, J.

122